**Nos. 24-5280, 24-5285**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STATE OF ALASKA,
*Plaintiff/Appellant*,

v.

WILLIAM KIRKLAND, in his official capacity
as Assistant Secretary-Indian Affairs, U.S. Department of the Interior, and
U.S. DEPARTMENT OF THE INTERIOR,
*Defendants/Appellees*, and

CENTRAL COUNCIL OF THE TLINGIT & HAIDA TRIBES OF ALASKA,
*Intervenor for Defendants/Appellee/Cross-Appellant.*

Appeal from the United States District Court for the District of Alaska
No. 3:23-cv-0007-SLG (Hon. Sharon L. Gleason)

**ANSWERING BRIEF FOR THE FEDERAL APPELLEES**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

Of counsel:

ROBERT HITCHCOCK
JOHN HAY
Solicitor's Office
U.S. Department of the Interior

CHARMAYNE STALOFF
JOHN L. SMELTZER
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, DC 20044
(202) 305-0343
john.smeltzer@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS .................................. ix

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ............................................................ 2

STATEMENT OF THE ISSUES ................................................................ 4

PERTINENT STATUTES AND REGULATIONS ........................................ 4

STATEMENT OF THE CASE .................................................................... 4

    A.    Legal Background ........................................................................ 4

        1.    Initial Federal Policy Toward Tribes in Alaska ...................... 4

        2.    IRA .................................................................................... 7

        3.    IRA's Applicability in Alaska ................................................ 9

        4.    Alaska IRA ......................................................................... 10

        5.    ANCSA ............................................................................... 12

        6.    FLPMA .............................................................................. 16

        7.    Land-Into-Trust Regulations ............................................... 17

        8.    Solicitors' Opinions on Land-Into-Trust Authority ............... 18

    B.    Administrative Proceedings ......................................................... 22

        1.    Application to Take Juneau Parcel into Trust ....................... 22

        2.    Land-Into-Trust Decision .................................................... 23

    C.    Proceedings Below ...................................................................... 24

D.     Post-Judgment Review of Agency Guidance on Taking
       Land into Trust for Tribes in Alaska..................................................26

SUMMARY OF ARGUMENT ..................................................................27

STANDARD OF REVIEW ......................................................................29

ARGUMENT ...........................................................................................29

I.     This Court lacks jurisdiction over the State's appeal. ...................29

       A.     Orders vacating and remanding agency decisions
              generally are not final for appeal purposes. .......................29

       B.     The exception to the remand-order rule does not apply.....................31

       C.     The State's arguments on the potential non-availability of
              future appellate review are misplaced. ................................35

              1.     This Court lacks jurisdiction over the Tribes'
                     appeal. ......................................................................35

              2.     Rule 19 and tribal sovereign immunity do not
                     foreclose a later appeal by the State...........................37

II.    Interior has reinstated its position against taking land into trust
       for tribes in Alaska..........................................................................42

CONCLUSION .......................................................................................43

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alaska v. Native Village of Venetie*,
  522 U.S. 520 (1998) ................................................................................16

*Akiachak Native Community v. U.S. Department of the Interior*,
  827 F.3d 100 (D.C. Cir. 2016) ...............................................................18

*Akiachak Native Community v. Salazar*,
  935 F. Supp. 2d 195 (D.D.C. 2013) .......................................................17

*Alsea Valley Alliance v. Department of Commerce*,
  358 F.3d 1181 (9th Cir. 2004) ................................................. 3, 29-32, 36, 37, 39

*Bakia v. County of Los Angeles*,
  687 F.2d 299 (9th Cir.1982) ...................................................................41

*Bodi v. Shingle Springs Band of Miwok Indians*,
  832 F.3d 1011, (9th Cir. 2016) ...............................................................39

*Buck v. Berryhill*,
  869 F.3d 1040 (9th Cir. 2017) ................................................................33

*Bugenig v. Hoopa Valley Tribe*,
  266 F.3d 1201 (9th Cir. 2001) ..................................................................8

*Cachil Dehe Band of Wintun Indians of the Colusa Indian
  Community v. California*, 547 F.3d 962 (9th Cir. 2008) ....................41

*Cachil Dehe Band of Wintun Indians of the Colusa Indian
  Community v. Zinke*, 889 F.3d 584 (9th Cir. 2018) ............................41

*Carcieri v. Salazar*,
  555 U.S. 379 (2009) ....................................................... 18-19, 25, 42

*Center for Biological Diversity v. Bureau of Land Management*,
  69 F.4th 588 (9th Cir. 2023) .........................................................3, 29, 31

*Cherokee Nation v. Georgia*,
   30 U.S. (5 Pet.) 1 (1831) ............................................................5

*Chugach Alaska Corp. v. Lujan*,
   915 F.2d 454 (9th Cir. 1990) ....................................................29

*Collord v. U.S. Department of Interior*,
   154 F.3d 933 (9th Cir. 1998) ..................................3, 31, 32, 33, 36, 38

*County of Amador v. United States Department of Interior*,
   872 F.3d 1012 (9th Cir. 2017) ..................................................42

*Corrigan v. Haaland*,
   12 F.4th 901 (9th Cir. 2021) ....................................................29

*Crow Indian Tribe v. United States*,
   965 F.3d 662 (9th Cir. 2020) ....................................................32

*County of Yakima v. Yakima Indian Nation*,
   562 U.S. 251 (1992) ..................................................................7

*Diné Citizens v. Bureau of Indian Affairs*,
   932 F.3d 843 (9th Cir. 2019) ....................................................38

*Environmental Protection Information Center, Inc. v. Pacific
   Lumber Co.*, 257 F.3d 1071 (9th Cir. 2001) ............................34

*Federated Indians of Graton Rancheria v. U.S. Dept' of the
   Interior*, Slip Op., 2025 WL 2096161 (July 18, 2025)
   (N.D. Cal. No. 24-cv-08582-RFL) ...........................................42

*Hodel v. Irving*,
   481 U.S. 704 (1987)..................................................................7

*In re Williams Sports Rentals, Inc.*,
   90 F.4th 1032 (9th Cir. 2024) ..................................................33

*Iowa Mutual Insurance Co. v. LaPlante*,
   480 U.S. 9 (1987)......................................................................5

*Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*,
    48 F.4th 934 (9th Cir. 2022) ...................................................38

*Maverick Gaming LLC v. United States*,
    123 F.4th 960 (9th Cir. 2024) ............................................38, 41

*Metlakatla Indian Community, Annette Islands Reserve v.
Egan*, 369 U.S. 45 (1962) .........................................................6

*Michigan v. Bay Mills Indian Community*,
    572 U.S. 782 (2014) ............................................................... 5-6

*Morton v. Mancari*,
    417 U.S. 535 (1974)................................................................ 7-8

*Musacchio v. United States*,
    577 U.S. 237 (2016)................................................................33

*Organized Village of Kake v. Egan*,
    369 U.S. 60 (1962)...................................................................5

*Parravano v. Babbitt*,
    70 F.3d 539 (9th Cir. 1995) .....................................................5

*Renteria-Hinojosa v. Sunsweet Growers, Inc.*,
    150 F.4th 1076 (9th Cir. 2025) ..............................................29

*Sac and Fox Nation of Missouri v. Norton*,
    240 F.3d 1250 (8th Cir. 2001) ...............................................41

*Sea-Land Serv., Inc. v. Dep't. of Transp.*,
    137 F.3d 640 (D.C. Cir. 1998)...............................................34

*State of Cal. ex rel. State Water Resources Control Bd. v.
FERC*, 966 F.2d 1541 (9th Cir. 1992) ...................................16

*Sturgeon v. Frost*,
    577 U.S. 424 (2016)...................................................4, 12, 13, 15

*Tlingit and Haida Indians of Alaska v. United States*,
    177 F. Supp. 452 (Ct. Cl. 1959)............................................22

*United States v. Washington*,
   573 F.3d 701 (9th Cir. 2009) ...................................................................6

*Worcester v. Georgia*,
   31 U.S. 515 (1832).......................................................................................5

*Yellen v. Confederated Tribes of Chehalis Reservation*,
   94 U.S. 338 (2021)...............................................6, 10, 12, 13, 14, 15


## Statutes

Administrative Procedure Act
5 U.S.C. § 706(a)(2) ...................................................................................2

8 U.S.C. § 1401 ............................................................................................5

25 U.S.C. § 398d .........................................................................................5

Indian Reorganization Act
25 U.S.C. § 5108.................................................................2, 4, 8, 18, 25
25 U.S.C. § 5110.........................................................................................9
25 U.S.C. § 5119.............................................................4, 11, 13, 25
25 U.S.C. § 5123.......................................................................................13
25 U.S.C. § 5123(f)..................................................................................18
25 U.S.C. § 5123(g)..................................................................................18
25 U.S.C. § 5124.......................................................................................13
25 U.S.C. § 5129.................................................................................9, 19

28 U.S.C. § 1291............................................................................3, 29, 39
28 U.S.C. § 1331 .........................................................................................2

43 U.S.C. § 150...................................................................................5, 12

Alaska Native Claims Settlement Act
43 U.S.C. § 1601(a)..................................................................................14
43 U.S.C. § 1601(b)..................................................................................14
43 U.S.C. § 1602.......................................................................................15
43 U.S.C. § 1602(d), (m)-(o) ...............................................................15
43 U.S.C. § 1602(i)...................................................................................15

43 U.S.C. § 1603 ...................................................................................14
43 U.S.C. § 1606(d) ..............................................................................16
43 U.S.C. § 1607(c) ...............................................................................16
43 U.S.C. § 1610-13 ...............................................................................15
43 U.S.C. § 1613(c) ...............................................................................15
43 U.S.C. § 1613(h) ...............................................................................15
43 U.S.C. § 1615 ....................................................................................15
43 U.S.C. § 1618(a) .........................................................................14, 15
43 U.S.C. § 1629b(a) .............................................................................16
43 U.S.C. § 1629e(a) .............................................................................16
43 U.S.C. § 1636(d)(1)(A) .....................................................................16

## Session Laws

Act of May 14, 1884, 23 Stat. 24 ............................................................6
Act of June 6, 1900, 31 Stat. 321 ...........................................................7
Act of June 30, 1919, 41 Stat. 34 ......................................................5, 12
Act of June 2, 1924, 43 Stat. 253 ...........................................................5
Act of June 18, 1934, 48 Stat. 984 ...................................................7-10
Act of May 1, 1936, 49 Stat. 1250 .............................................11, 12, 16

Pub. L. 94–579, 90 Stat. 2743 (October 21, 1976) ................................16

## Federal Rules & Regulations

Fed. R. App. P. 4(a)(1)(B) .......................................................................2

Fed. R. Civ. P. 19 ..................................................................................37

25 C.F.R. § 120a.1 (1980) .....................................................................17

25 C.F.R. § 151.4 ..................................................................................19
25 C.F.R. § 151.10(a) (2022) .................................................................19

## Federal Register

45 Fed. Reg. 62,034 (Sept. 18, 1980) ...............................................12, 17
89 Fed. Reg. 99,899 (Dec. 11, 2024) .....................................................22

## Other

Exec. Order No. 14153, § 3(xvi),
    90 Fed. Reg. 8347, 8350 (Jan. 20, 2025)............................................................26

Felix S. Cohen,
    Handbook of Federal Indian Law 147 (1982 ed.) ................................................8

H.R. Rep. No. 2244, 74th Cong., 2d Sess. (1936)....................................................11

Solicitor's Opinion, Thomas L. Sansonetti,
    M-36975 (Jan. 11, 1993)....................................................................13, 14

Solicitor's Opinion, Hillary C. Tompkins,
    M-37043 (Jan. 13, 2017) ...............................................................................19

Solicitor's Opinion, Daniel H. Jorjani,
    M-37053 (June 29, 2018)................................................................................20

Solicitor's Opinion, Daniel H. Jorjani,
    M-37064 (Jan. 19, 2021)................................................................................20

Solicitor's Opinion, Robert T. Anderson,
    M-37069 (Apr. 27, 2021)................................................................................21

Solicitor's Opinion, Robert T. Anderson,
    M-37076 (Nov. 16, 2022)................................................................................22

See Solicitor's Opinion, William L. Doffermyre,
    M-37087 (Feb. 24, 2026)................................................................................26

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Alaska IRA ........................................Alaska Indian Reorganization Act

ANCSA......................................Alaska Native Claims Settlement Act

APA ........................................................Administrative Procedure Act

FLPMA ..............................Federal Land Policy and Management Act

IRA................................................................Indian Reorganization Act

The Tribe................................................ Central Council of the Tlingit
and Haida Indian Tribes of Alaska

# INTRODUCTION

In November 2022, the Department of the Interior ("Interior") agreed to take a small parcel of land in Juneau, Alaska ("Juneau parcel") into trust for the Central Council of the Tlingit and Haida Indian Tribes of Alaska (the "Tribe") and to declare the land a tribal reservation. Appellant the State of Alaska challenged that decision on the view that the 1971 Alaska Native Claims Settlement Act ("ANCSA") precludes Interior from establishing Indian country in Alaska and therefore from acquiring the parcel in trust. The district court held that ANSCA did not repeal Interior's authority under the 1934 Indian Reorganization Act ("IRA") and 1936 Alaska Indian Reorganization Act ("Alaska IRA"), to take land into trust for tribes in Alaska. But the court determined that such authority is limited to tribes that were "under federal jurisdiction" when the IRA and Alaska IRA were enacted. The district court set aside Interior's decision to take the Juneau parcel into trust for the Tribe on the view that Interior: (1) failed to determine whether the Tribe was under federal jurisdiction in 1934 or 1936; and (2) acted arbitrarily and contrary to ANSCA in citing land "restoration" as a basis for the trust acquisition.

Although Alaska thus prevailed in obtaining vacatur of Interior's decision, Alaska appeals the district court's determination that Interior retains authority, post-ANCSA, to take land into trust for tribes in Alaska. Because the district court

set aside Interior's decision and remanded the case for further administrative review, the district's court judgment is not final for purposes of appellate jurisdiction. Moreover, as explained herein, Interior's decision to take the Juneau parcel into trust for the Tribe was a substantial departure from Interior's longstanding policy and practice, following ANCSA, to refrain from taking land into trust for tribes in Alaska. The challenged decision was based on a 2022 Solicitor's Opinion, which the current administration suspended upon taking office and has since withdrawn as legally deficient. Accordingly, while Interior now acknowledges that Alaska raises valid concerns in its appeal, the State's appeal (as well as the conditional cross-appeal filed the by Tribe) are premature and should be dismissed.

## STATEMENT OF JURISDICTION

(a)     The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because this case involves claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(a)(2), that Interior acted contrary to federal law, namely, the IRA, 25 U.S.C. § 5108, when taking land into trust for the Tribe.

(b)     The district court entered judgment on June 27, 2024, setting aside Interior's decision and remanding the matter to the agency. 1-ER_2. Alaska timely filed a notice of appeal on August 23, 2024. 2-ER_51-52; Fed. R. App. P. 4(a)(1)(B). The Tribe timely filed a notice of appeal on August 26, 2024.

2-ER_47-48; Fed. R. App. P. 4(a)(1)(B).  Interior also filed a notice of appeal,

2-ER_43-44, but this Court dismissed that appeal (Non Interior's motion.

DktEntry 43.1 (June 30, 2025) (No. 24-5280).

(c)     For reasons explained herein (pp. 29-42, *infra*), this Court lacks

appellate jurisdiction.[1]  The district court's remand order—setting aside the

challenged land-into-trust decision for further administrative proceedings—is not a

final judgment under 28 U.S.C. § 1291.  *See Alsea Valley Alliance v. Department*

*of Commerce*, 358 F.3d 1181, 1184 (9th Cir. 2004).  Although the district court

rejected Alaska's argument that Interior lacks authority to take land into trust for

tribes in Alaska, the district court's judgment did not conclusively resolve that

issue, and appellate review will not "as a practical matter, be foreclosed" on that

issue by the denial of an immediate appeal.  *See Center for Biological Diversity v.*

*Bureau of Land Management*, 69 F.4th 588, 594 (9th Cir. 2023) (quoting *Collord*

*v. U.S. Department of Interior*, 154 F.3d 933, 935 (9th Cir. 1998)).  Accordingly,

the exception to the ordinary rule—that remand orders are nonfinal for appeal

purposes—does not apply.  *Id.*

---

[1] The Tribe moved to dismiss the State's appeal for lack of appellate jurisdiction.
*See* DktEntry 30.1 (No. 24-5280) (Feb. 28, 2025).  This Court denied that motion
"without prejudice to renewing the arguments" during merits briefing.  *See*
DktEntry 45.1 (No. 24-5280) (Sept. 25, 2025).

3

## STATEMENT OF THE ISSUES

1.  Whether this Court has appellate jurisdiction, where the district court set aside Interior's decision to take land into trust for the Tribe pending further administrative proceedings, and,

2.  If this Court determines that it has appellate jurisdiction, whether Interior retains authority under the IRA (25 U.S.C. § 5108) and Alaska IRA (25 U.S.C. § 5119) to take land into trust for tribes in Alaska, notwithstanding the enactment of ANCSA.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are described below and set forth in the addendum following this brief.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. Initial Federal Policy Toward Tribes in Alaska

The United States acquired the Territory of Alaska from Russia in 1867. *Sturgeon v. Frost*, 577 U.S. 424, 428 (2016). The Treaty of Cession granted the "inhabitants" of the territory the right to "return to Russia" or to remain in Alaska and become U.S. citizens, "with the exception of [so-called] uncivilized tribes." 15 Stat. 539, 542 (Art. III). The Treaty called for tribes in Alaska and their members to be treated in the same manner as Indians in the lower 48 states, i.e., they were to

be "subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of [the United States]." *Id.*

At that time, federal law recognized aboriginal tribes to be "distinct political communities" akin to foreign nations, *see Worcester v. Georgia*, 31 U.S. 515, 556-557 (1832), and members of tribes born within the United States were not U.S. citizens by virtue of such birth. *See Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9, 17 (1987).[2] The United States' policy was to negotiate with tribes as with foreign nations, and to enter into treaties with them to reserve lands over which they could continue to exercise self-government. *See Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). Congress ended treatymaking with tribes in 1871. *See* 25 U.S.C. § 71; *Organized Village of Kake v. Egan*, 369 U.S. 60, 72 (1962). But Presidents continued to reserve public lands for tribes through Executive Orders, *Parravano v. Babbitt*, 70 F.3d 539, 545 (9th Cir. 1995),[3] creating reservations over which tribes exercised "inherent sovereign authority" as "domestic dependent nations." *See Michigan v. Bay Mills Indian Community*, 572

---

[2] Congress granted birth-right citizenship to Indians in 1924. *See* Act of June 2, 1924, ch. 233, 43 Stat. 253 (codified at 8 U.S.C. § 1401). This grant did not alter the principle of tribal sovereignty. *See Iowa Mutual*, 480 U.S. at 18 n.10.

[3] Congress ended this practice in 1919, *see* Act of June 30, 1919, c. 4, § 27, 41 Stat. 34 (43 U.S.C. § 150); *see also* 25 U.S.C. § 398d.

U.S. 782, 788 (2014); *see also United States v. Washington*, 573 F.3d 701, 707-08 (9th Cir. 2009).

In Alaska, however, federal Indian policy played out differently. Due to Alaska's remoteness and limited land conflicts between new settlers and Native Alaskans, the federal government did not "attempt in Alaska to isolate Indians on reservations" as it did in the lower 48 States. *Yellen v. Confederated Tribes of Chehalis Reservation*, 594 U.S. 338, 342 (2021) (quoting *Metlakatla Indian Community, Annette Islands Reserve v. Egan*, 369 U.S. 45, 51 (1962)); *see also Confederated Tribes*, 594 U.S. at 342 & n.2. In 1891, Congress reserved land on Annette Island, on the extreme lower end of the Alaskan archipelago in southeast Alaska, for the Metlakatla Tribe, which had then "recently emigrated from British Columbia." Act of March 30, 1891, § 15, 26 Stat. 1095, 1101; *see also Metlakatla Indian Community*, 369 U.S. at 48. And the United States created other limited reserves. *See Confederated Tribes*, 594 U.S. at 342 & n.2.

But for the most part, while acknowledging Native land claims, the federal government did not act to resolve them. In 1884, Congress enacted an "Organic Act" for governance of the Alaska Territory. Act of May 14, 1884, 23 Stat. 24. The Act opened Alaska to mining, with the proviso that "the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their occupation or now claimed by them." *Id.* § 7, 23 Stat. 26. But Congress

6

"reserved for further legislation" the "terms under which" Alaska Natives could "claim title to such lands." *Id.* In a second Organic Act enacted in 1900, Congress reaffirmed that the "Indians . . . in the district shall not be disturbed in the possession of any lands now actually in their use or occupation." Act of June 6, 1900, § 27, 31 Stat. 321, 330 330. But Congress again provided no mechanism to resolve tribal land claims.

### 2. IRA

In the late 1800s, Congress initiated a policy to terminate Indian reservations in the lower-48 states by "allotting" reservation lands to individual Indians and granting the lands to the allottees in fee. *See County of Yakima v. Yakima Indian Nation*, 562 U.S. 251, 253 (1992) (citing 1887 General Allotment Act and similar laws). This policy aimed to "extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large." *Id.* But this policy "proved disastrous for Indians," *Hodel v. Irving*, 481 U.S. 704, 707 (1987), divesting tribes of their lands and diminishing their powers of self-government, *see County of Yakima*, 562 U.S. at 253-55.

Congress enacted the IRA in 1934 to reverse the allotment policy, *id.* at 253; *see also* Act of June 18, 1934, c. 576, 48 Stat. 984, and to "establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari*, 417 U.S.

535, 542 (1974). The IRA aimed to preserve and enhance tribal land bases to "encourage economic development, self-determination, cultural plurality, and the revival of tribalism." *See Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1205 (9th Cir. 2001) (quoting Felix S. Cohen, Handbook of Federal Indian Law 147 (1982 ed.)). To that end, the IRA provided mechanisms for Indian tribes to "organize for [their] common welfare," by adopting "constitutions and bylaws" subject to Secretarial approval, *id*. § 16, 48 Stat. 987, and by forming tribal corporations under federal law, *id*. § 17, 48 Stat. 988.

To preserve tribal lands, the IRA halted new allotments on the "land of any Indian reservation, created or set apart by treaty or agreement with the Indians, Act of Congress, Executive order, purchase, or otherwise," *id.* § 1, and "extended and continued until otherwise directed by Congress" the "existing periods of trust placed upon any Indian lands and any restriction on alienation thereof," *id*. § 2. In addition, Section 5 of the IRA authorized the Secretary of the Interior

> in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations . . . for the purpose of providing land for Indians.

Act of June 18, 1934, c. 576, § 5, 48 Stat. 985; *see also* 25 U.S.C. § 5108 (present codification). Section 5 specifies that "[t]itle to any lands" so acquired "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt

8

from State and local taxation." *Id.* In addition, in Section 7 of the IRA, Congress authorized the Secretary of the Interior

> to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by this Act, or to add such lands to existing reservations.

Act of June 18, 1934, c. 576, § 7, 48 Stat. 986; 25 U.S.C. § 5110.

To guide Interior's implementation of these provisions, Congress promulgated the following definitions in IRA Section 19:

> The term "Indian" . . . shall include all persons of Indian descent who [1] are members of any recognized Indian tribe now under Federal jurisdiction, and [2] all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include [3] all other persons of one-half or more Indian blood. For the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation.

Act of June 18, 1934, c. 576, § 19, 48 Stat. 988; 25 U.S.C. § 5129.

### 3. IRA's Applicability in Alaska

While declaring that the "Eskimos and other aboriginal peoples of Alaska shall be considered Indians" for purposes of the IRA, *id.*, Congress initially limited the IRA provisions applicable in the Territory of Alaska to sections 9, 10, 11, 12, and 16. *See* Act of June 18, 1934, § 13, 48 Stat. 986-87. IRA Sections 5 and 7—which authorize Interior to take land into trust for Indians and to make reservation declarations—were not originally applicable in Alaska. *Id.*

9

Moreover, there were two substantial anomalies in the way Congress adopted the named sections for Alaska.  *First*, Congress declared that Section 10—which authorized loans to federally-chartered Indian corporations—would apply to Alaska.  *Id.* § 13, 48 Stat. 986-87.  But Congress did not make Section 17 applicable to Alaska, which provided the only means tribes could obtain corporate charters to qualify for loans.  *Id.* §§ 10, 13, 17, 48 Stat. 986-88.[4]  In addition, while the IRA declared that Section 16—which authorized Indian tribes to organize under constitutions and bylaws to be approved by Interior—would apply in Alaska, that provision (as originally drafted) was limited to any "Indian tribe, or tribes, residing on the same reservation," *id.* § 16, 48 Stat. 87, a circumstance that did not occur in Alaska (except for the Metlakatla Tribe), *see Confederated Tribes*, 594 U.S. at 342.

### 4.    **Alaska IRA**

Congress enacted the Alaska IRA in 1936, to fix the above "unintentional omission[s]" in the IRA, and to adapt the IRA to the circumstances of Alaska to "allow the Indians of Alaska to participate in the benefits" of the IRA "to the same

---

[4] The other sections made applicable to Alaska: (1) authorized funding to "defray[] the expenses of organizing Indian chartered corporations," (2) authorized loans to Indians for educational expenses, and (3) directed Interior to establish qualifications for Indians to be appointed to the civil service.  *Id.* § 13 (referencing §§ 9, 11, and 12).

extent and manner as the Indians of the United States proper." *See* H.R. Rep. No. 2244, 74th Cong., 2d Sess., at 3 (1936). The act contained two parts.

*First*, Section 1 of the Alaska IRA declared that specified additional IRA provisions, including Section 5 (land trust acquisitions), Section 7 (reservation declarations), Section 17 (tribal corporations), and Section 19 (definitions) "shall hereafter apply to the Territory of Alaska," subject to the following proviso:

> [G]roups of Indians in Alaska not heretofore recognized as bands or tribes but having a common bond of occupation, or association, or residence within a well-defined neighborhood, community, or rural district, may organize to adopt constitutions and bylaws and to receive charters of incorporation and Federal loans under sections 16, 17, and 10 of [the IRA]."

Act of May 1, 1936, c. 254, § 1, 49 Stat. 1250 (now codified at 25 U.S.C. § 5119). The House Report on the bill explained that this "common bond" proviso was "necessary" due to the "peculiar nontribal organizations under which the Alaska Indians operate," or, in other words, because "[m]any groups that would otherwise be termed 'tribes'" lived within and organized themselves by "villages," which Congress deemed a different organizational structure. H.R. Rep. 2244, 74th Cong., 2d Sess., at 1-2 (1936) (accompanying H.R. 9866).

*Second*, Section 2 authorized the Secretary of the Interior, with the consent of resident Alaksa natives, to "designate as an Indian reservation" (1) "any area of land" that already had been "reserved for the use and occupancy of Indians or Eskimos" by the 1884 Organic Act or other named statutes, or (2) "any other

public lands which are actually occupied by Indians or Eskimos within said Territory." *Id.* § 2, 49 Stat. at 1250-51. This provision gave the Secretary authority to create Indian reservations from public lands in Alaska, an authority that had been terminated (as to public lands generally) in 1919. *See* Act of June 30, 1919, c. 4, § 27, 41 Stat. 34 (43 U.S.C. § 150).

In a letter accompanying the House Report, Secretary of the Interior Harold Ickes explained that "Indian tribes do not exist in Alaska in the same sense as in [the] continental United States," not only because of their village organizational structure, but because "[w]ith a few exceptions the lands occupied by [the] natives of Alaska have not been designated as reservations." *Id.* at 4. By enabling native occupied lands to be designated as reservations, Section 2 of the Alaska IRA would assist tribes in Alaska (Native Villages) in exercising self-government and would "fulfill[] in part" the United States' "moral and legal obligations" to "protect[]" native lands and "economic rights," as expressed in the 1884 Organic Act and other statutes. *Id.*

### 5. ANCSA

Alaska acquired statehood in 1959. *Confederated Tribes*, 594 U.S. at 342. At that time, 98 percent of the 365 million acres in Alaska—including lands occupied by Native Villages—were owned by the federal government. *Sturgeon*, 577 U.S. at 429. The Statehood Act gave Alaska the right to "select" for state

ownership "103 million acres of land" from the "vacant, unappropriated, and unreserved" federal land, *Sturgeon*, 577 U.S. at 429 (citing Pub. L. 85-508, §§ 6(a)-(b), 72 Stat. 640 (July 7, 1958)), subject to the State's disclaimer of interest in any lands "the right or title to which may be held by any Indians, Eskimos. or Aleuts . . . or is held by the United States in trust for [such] natives." Pub. L. 85-508, § 4, 72 Stat. 339. This grant made it imperative to identify what lands were held by or for Alaska Natives and thus excluded from State selection. *Id*. In addition, oil was discovered at Prudhoe Bay in 1969, prompting a need to quiet title to disputed Alaska lands to enable oil development. See *Cook Inlet Region, Inc. v. Rude*, 690 F.3d 1127, 1129 (9th Cir. 2012). Both factors prompted Congress to enact ANCSA in 1971. *See Sturgeon*, 577 U.S. at 429-30.

At that time, 69 Alaska Native villages had organized under the IRA (25 U.S.C. §§ 5119, 5123), and many of these villages had also acquired corporate charters (25 U.S.C. § 5124). *See* Solicitor's Opinion, M-36975, Thomas L. Sansonetti, at 33 (Jan. 11, 1993).[5] But only 23 "reserves" had been established for Alaska Natives, and only six under the Alaska IRA, leaving most aboriginal land claims unresolved. *Id.* at 87-88; *see also Confederated Tribes*, 594 U.S. at 342 n.2.

---

[5] Available at https://www.doi.gov/sites/doi.gov/files/uploads/m-36975.pdf

In ANCSA, Congress declared an "immediate need for a fair and just settlement of all [aboriginal land] claims by Natives and Native groups of Alaska." 43 U.S.C. § 1601(a). And Congress declared the need to accomplish the settlement "rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges . . ." *Id*. § 1601(b).

To achieve these goals, Congress "officially dispensed with the idea of recreating in Alaska the system of reservations that prevailed in the lower 48 States." *Confederated Tribes*, 594 U.S. at 343. ANCSA extinguished all "aboriginal title in Alaska based on land use or occupancy," extinguished all Native land claims based on aboriginal rights, treaties, or statutes, 43 U.S.C. § 1603, and "revoked" all existing Alaska reservations (excluding the "Annette Island Reserve" for the Metlakatla Indian community"). 43 U.S.C. § 1618(a).[6] In exchange, ANCSA gave Alaska Natives monetary compensation and the right to

---

[6] ANCSA did not affect lands purchased by the United States in fee and held in trust for the Village of Kake and other southeast Alaska communities. *See* M-36975 at 112, n.277.

participate in land ownership, including as shareholders of regional, village, and other Native corporations to be chartered under state law. *See Confederated Tribes*, 594 U.S. at 343-44.

ANCSA directed the Secretary to withdraw specified public lands in and around Native Villages, provided procedures for Village and Regional Corporations to select from the withdrawn lands,[7] and provided procedures for the conveyance of the selected lands, in fee, to the respective corporations. *See* 43 U.S.C. §§ 1610-13, 1615; *see also id.* § 1602 (definitions). ANCSA further directed Village Corporations to reconvey surface estates, in fee, to the occupants of occupied lands, and to convey other lands necessary for municipal purposes to Municipal Corporations. 43 U.S.C. §§ 1602(i), 1613(c). In addition, ANCSA empowered the Secretary to withdraw and convey additional lands to Native Corporations formed by Native groups meeting criteria short of the criteria specified for Native Villages. *See* 43 U.S.C. §§ 1613(h)(2)-(3); *see also* 43 U.S.C. § 1602(d), (m)-(o) (definitions). All told, ANCSA provided for the transfer of 40 million acres to Native Corporations and the payment of $960 million in monetary compensation. *Sturgeon*, 577 U.S. at 430.

---

[7] Native Villages that occupied lands already reserved for them could opt, through their Village Corporations, to acquire such lands in fee, in lieu of participating in land withdrawal and selection under ANCSA and participation in Regional Corporations. *See* 43 U.S.C. § 1618(b).

To protect Native interests, ANCSA placed restrictions on the issuance and transfer of shares in Regional and Village corporations. *See* 43 U.S.C. §§ 1606(d), 1607(c) (20-year restriction); *see also* 43 U.S.C. § 1629b(a) (1987 amendment) (extending restriction). And under ANCSA as amended, Native Corporations may transfer any corporate "assets," including lands, to a state-law "Settlement Trust," 43 U.S.C. § 1629e(a), to shield the assets from state taxation and judgments. 43 U.S.C. § 1636(d)(1)(A). But ANCSA does not restrict the alienation of real property held by Native Corporations. *Native Village of Venetie*, 522 U.S. at 532.

### 6.    FLPMA

When settling Alaska Native land claims through ANCSA and revoking existing land reservations in favor of the ANSCA's settlement scheme, Congress did not amend the IRA or the Alaska IRA. But in 1976, Congress enacted the Federal Land Management and Policy Act ("FLPMA") to comprehensively reform the management of all public lands. *See State of Cal. ex rel. State Water Resources Control Bd. v. FERC*, 966 F.2d 1541, 1556-57 (9th Cir. 1992). In so doing, Congress repealed numerous statutes relating to land withdrawals, including Section 2 of the Alaska IRA (*supra*), which had authorized the withdrawal of public lands in Alaska for Indian reservations. *See* Pub. L. 94–579, § 704(a), 90 Stat. 2743, 2792 (October 21, 1976) (referencing Act of May 1, 1936, c. 254, § 2, 49 Stat. 1250)).

### 7. Land-Into-Trust Regulations

In 1980, Interior issued new rules to govern its discretionary authority to take land into trust for Indians. 45 Fed. Reg. 62,034, 62,036 (Sept. 18, 1980). In view of the settlement of Alaska Native land claims in ANCSA, Interior determined that Congress "did not contemplate the further acquisition of land in trust status, or the holding of land in such status in the State of Alaska." 45 Fed. Reg. 62,034. Accordingly, Interior specified that the new regulations did "not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its members." *Id.* at 62,036 (25 C.F.R. § 120a.1 (1980)).

In 2001, in response to concerns from tribes in Alaska, Interior committed to revisiting this so-called Alaska exclusion. 66 Fed. Reg. 3452, 3454 (Jan. 16, 2001). But Interior did not then alter its policy. *Id.*

Several tribes in Alaska subsequently sued to compel Interior to rescind the Alaska exclusion. *See Akiachak Native Community v. Salazar*, 935 F. Supp. 2d 195 (D.D.C. 2013). The United States District Court for the District of Columbia held that Interior retains authority under the IRA and Alaska IRA to take land into trust in Alaska, and that Interior's blanket policy against taking land into trust for Alaska tribes violated IRA provisions added in 1994, which prohibit federal agencies from "classify[ing], enhanc[ing], or diminish[ing] the privileges and

17

immunities available to a federal recognized Indian tribe relative to the privileges and immunities available to other recognized tribes by virtue of their status as Indian tribes." *Id.* (quoting 25 U.S.C. § 5123(f)); *see also* 25 U.S.C. 5123(g). Alaska appealed.

During the pendency of that appeal, Interior withdrew the Alaska exclusion. 79 Fed. Reg. 76888 (Dec. 23, 2014). Interior explained that it did not "seek to undo or contravene the settlement codified in ANCSA," *id.*, but had concluded, following a statutory review, that "the Secretary retains discretionary authority to take land into trust in Alaska under Section 5 of the IRA." *Id.*

The D.C. Circuit subsequently dismissed Alaska's appeal as moot and ordered the district court's *Akiachak* decision vacated. *Akiachak Native Community v. U.S. Department of the Interior*, 827 F.3d 100 (D.C. Cir. 2016).

### 8.  Solicitors' Opinions on Land-Into-Trust Authority

#### a.  2017 Tompkins Opinion

In the 2014 rulemaking withdrawing the Alaska exclusion from its land-into-trust regulations (*supra*), Interior did not specify how it would implement the regulations in Alaska generally or under the Supreme Court's decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009). As explained above, IRA Section 5 authorizes trust acquisitions for "Indians," 25 U.S.C. § 5108, and IRA Section 19 defines "Indian" to mean, in part, all "members of any recognized Indian tribe *now under*

*Federal jurisdiction*," 25 U.S.C. § 5129 (emphasis added). In *Carcieri*, the
Supreme Court held that "now under Federal jurisdiction" "unambiguously" limits
the IRA's trust acquisition authority to tribes that were "under Federal jurisdiction"
when the IRA was enacted. *Carcieri*, 555 U.S. at 395. Consistent with *Carcieri*,
Interior's land-into-trust regulations generally require, as part of a tribal land-into-
trust application, evidence of the tribe's jurisdictional status in 1934. *See* 25
C.F.R. § 151.4 (current regulation); *see also* 25 C.F.R. § 151.10(a) (2022) (prior
version in in effect in 2017).[8]

In January 2017, seven days before the start of a new Administration,
Interior Solicitor Hillary C. Tompkins determined that tribes in Alaska are not
subject to the above requirement. Solicitor's Opinion, M-37043, Hillary C.
Tompkins, at 13-14 (Jan. 13, 2017).[9] The Solicitor reasoned that the clause of
Section 19 that declares "Eskimos and other aboriginal peoples of Alaska" to be
"Indians" operates as a separate "stand-alone" definition of Indian, obviating the
need for tribes in Alaska to rely on the IRA's first definition of Indian. *Id.*

---

[8] This requirement specifically applies to tribes who rely on the IRA's "first
definition" of Indian, *id.*, the only definition that specifically references tribes, *see*
25 U.S.C. § 5129; *see also supra*, p. 9. Interior revised its land-into-trust
regulations in 2023, *see* 88 Fed. Reg. 86,222 (Dec. 12, 2023).

[9] Available at https://www.doi.gov/sites/default/files/uploads/m-37043.pdf

### b.    2018 and 2021 Jorjani Opinions

In 2018, under the first Trump Administration, Interior Solicitor Daniel H. Jorjani withdrew the Tompkins opinion "pending review."  *See* Solicitor's Opinion, Daniel H. Jorjani, M-37053 (June 29, 2018).[10]  Jorjani determined that Interior failed to provide sufficient opportunity for public comment prior to the 2014 rulemaking that removed the Alaska exclusion from the land-into-trust regulations, and that Interior needed more time to review legal issues that the Tompkins opinion left unaddressed, both as to whether Interior had authority to take land into trust for tribes in Alaska and, if so, how to implement that authority under *Carcieri* and otherwise.  *Id.* at 4-5.

On January 19, 2021, Jorjani made the withdrawal of the Tompkins opinion permanent.  *See* Solicitor's Opinion, Daniel H. Jorjani, M-37064 (Jan. 19, 2021).[11] Jorjani explained that treating all federally recognized tribes in Alaska as eligible for trust acquisitions under the IRA was a "departure" from the policy that the Department adopted in the wake of ANCSA and had long maintained.  *Id.* at 1-2.

---

[10] Available at https://www.doi.gov/sites/default/files/uploads/m-37053.pdf.  At the time of this opinion, Jorjani was the Principal Deputy Solicitor exercising the authority of the Solicitor.  *See id.*

[11] Available at https://www.doi.gov/sites/default/files/m-37064-permanent-withdrawal-of-sol-op-m-37043-authority-to-acquire-land-into-trust-in-alaska.-01.19.2021-and-memo-executed.pdf

Upon further review and considering stakeholder comments, Jorjani found the Tompkins opinion insufficient to support the view that Interior retains broad authority to take land into trust for tribes in Alaska. *Id.* at 2. Jorjani concluded that the "legal uncertainty and questions of appropriate Department policy" regarding Interior's trust-acquisition authority in Alaska would be "best answered" by Congress. *Id.*, Att. at 4.

### c.     2021 and 2022 Anderson Opinion

On April 27, 2021, Interior Solicitor Robert T. Anderson again reversed course on this issue, withdrawing the 2021 Jorjani Opinion and announcing that Interior would begin processing land-into-trust applications from tribes in Alaska following a 90-day period of consultation with such tribes. *See* Solicitor's Opinion, Robert T. Anderson, M-37069 (Apr. 27, 2021).[12] On November 16, 2022, Solicitor Anderson issued an opinion: (1) confirming the Secretary's authority under the IRA and Alaska IRA to take land into trust for Alaska Natives and Alaska tribes, and (2) concluding, consistent with the Tompkins opinion, that the IRA provides a "stand-alone" definition of Indian for tribes in Alaska, making all federally recognized Alaska tribes eligible for IRA trust acquisitions, without regard to whether they were "under Federal jurisdiction" at the time of the IRA or

---

[12] Available at https://www.doi.gov/sites/default/files/m-37069.pdf. At the time, Anderson was Principal Deputy Solicitor. *Id.*

Alaska IRA.  *See* Solicitor's Opinion, Robert T. Anderson, M-37076 (Nov. 16, 2022).[13]  Interior's decision in this case was based on the Anderson opinion, which the current Administration has since withdrawn.  *See* pp. 26, *infra*.

### B.    Administrative Proceedings

#### 1.    Application to Take Juneau Parcel into Trust

The Tribe (Central Council of the Tlingit and Haida Indian Tribes of Alaska) is a federally recognized tribe of Indians, *see* 89 Fed. Reg. 99,899, 99,902 (Dec. 11, 2024), who have occupied lands on the coast and coastal islands of Southeast Alaska since before Alaska's cession.  *See Tlingit and Haida Indians of Alaska v. United States*, 177 F. Supp. 452, 455 (Ct. Cl. 1959).  In 2016, the Tribe filed an application asking Interior to take into trust for the Tribe a 787-square-foot parcel then owned by the Tribe in fee.[14] 2-ER_118.  The parcel lies within the "Juneau Indian Village" an area in Juneau containing fee or restricted-fee lands held by individual members of the Tribe.  2-ER_118, 125.

In accordance with its land-into-trust regulations, Interior provided notice to Alaska and to the City of Juneau ("Juneau"), to solicit information on the potential

---

[13] Available at https://www.doi.gov/sites/default/files/m-37076-alaska-trust-lands-m-opinion-11.16.2022.pdf

[14] This application was one of five applications involving multiple parcels totaling approximately 3.5 acres.  *See* 2-ER_109.

impacts of the proposed trust acquisition on State and local regulatory jurisdiction, real property taxes, and special assessments. 2-ER_117-18; *see also* 25 C.F.R. § 151.12(d). Alaska and Juneau submitted comments. 2-ER_117. But Interior did not act on the application prior to the 2018 Jorjani opinion (*supra*), which halted the processing of fee-to-trust applications in Alaska. After Interior renewed the processing of such applications under the 2021 Anderson opinion (*supra*), Interior solicited supplemental comments from Alaska and Juneau. 2-ER_118.

### 2. Land-Into-Trust Decision

Assistant Secretary–Indian Affairs Bryan Newland approved the Tribe's land-into-trust application for the Juneau parcel through a written decision issued on November 17, 2022. 2-ER_115. Relying on the 2022 Anderson opinion (*supra*), the Assistant Secretary determined that Interior may take land into trust for any federally recognized Alaska tribe without need for a showing that the tribe was "under Federal jurisdiction" at the time the IRA or Alaska IRA were enacted. 2-ER_115, 119-20 & n.31. Accordingly, Interior did not make any determination as to whether the Tribe was under Federal jurisdiction in 1934 or 1936 for purposes of IRA Sections 5 and 19.

As to the Juneau parcel, the Assistant Secretary found that its trust acquisition would benefit the Tribe by facilitating tribal sovereignty and self-determination, by rendering the land eligible for federal benefits and programs

available only to trust lands, and by aiding in the "restoration of Indian lands." 2-ER_120, 125-27. Conversely, the Assistant Secretary found that the proposed trust acquisition would not significantly impact Juneau's tax revenues or cause significant jurisdictional problems or land use conflicts. 2-ER_120-23. The Assistant Secretary noted that: (1) the Tribe agreed to remit a "payment in lieu of taxes" to compensate for municipal services that the city would continue to provide with respect to the subject land. 2-ER_121; (2) the Tribe intends to use the parcel consistent with City zoning, 2-ER_122; (3) the Tribe agreed to adhere to health, safety, building, and fire codes at least as stringent as city codes, 2-ER_123; and (4) the trust acquisition will not impact State civil and criminal jurisdiction under "Public Law 280." 2-ER_121-22; *see also* 18 U.S.C. § 1362(a) and 28 U.S.C. § 1360 (granting Alaska jurisdiction over all criminal and civil actions arising in "[a]ll Indian country within the State").

### C. Proceedings Below

Alaska filed this action for declaratory and injunctive relief in January 2023, alleging that the Assistant Secretary erred, as a matter of law: (1) in determining that Interior retains authority to take land into trust for Tribes in Alaska, and (2) in determining that the Tribe is not required to present evidence that it was "under Federal jurisdiction" in 1934 or 1936 to qualify for a trust acquisition. 2-ER_110-112 (¶¶ 47, 51). Alaska also alleged that Interior acted arbitrarily in relying on the

24

Tribe's desire to restore its "traditional homelands."  2-ER_111 (¶ 48).  The district court granted a motion by the Tribe to intervene as defendant.  3-ER_548 (Dkt. 9).  The parties filed motions for summary judgment.  *See* 1-ER_3-4.

In a decision entered on June 26, 2024, the district court held that Interior retains authority under the IRA and Alaska IRA to take lands into trust for tribes in Alaska.  *See* 1-ER_3-41.  The court held that IRA Section 5 (25 U.S.C. § 5108) can "coexist" with ANCSA, and that Congress did not intend for ANCSA to substitute entirely for the authorities set out in Section 1 of the Alaska IRA (25 U.S.C. § 5119).  1-ER_26-31.

But the district court vacated Interior's decision regarding the Juneau parcel for two reasons.  1-ER_31-39.  *First*, the court found the decision to be arbitrary and capricious "to the extent that" it relied on the rationale of land "restoration," which the court deemed contrary to ANCSA.  1-ER_33, 41.  *Second,* the court held that Interior's interpretation of IRA § 19—as containing a "stand alone" definition of "Indian" for Alaska—is contrary to the Supreme Court's statement in *Carcieri* that the IRA contains "only three discrete definitions" of Indian.  1-ER_36 (quoting *Carcieri*, 555 U.S. at 391-92).  Because Interior made no findings on the jurisdictional status of the Tribe in 1934 or 1936, the district court declined to address this issue in the first instance.  1-ER_38-40.  The court set aside Interior's decision and remanded the matter for further proceedings.  1-ER_2, 41.

### D. Post-Judgment Review of Agency Guidance on Taking Land into Trust for Tribes in Alaska

In January 2025, upon the change in administration, President Trump issued an Executive Order entitled "Unleashing Alaska's Extraordinary Resource Potential," which, as relevant here, directed Interior to "immediately review all . . . guidance regarding the taking of Alaska Native lands into trust," Exec. Order No. 14153, § 3(xvi), 90 Fed. Reg. 8347, 8350 (Jan. 20, 2025).[15] On February 28, 2025, Gregory Zerzan, a Senior Advisor exercising the delegated authority of the Solicitor, issued an order placing all "M-opinions issued in the last administration" under "suspension review."[16]

Interior has now completed its review of the 2021 and 2022 Anderson opinions (*supra*). On February 24, 2026, Interior Solicitor William L. Doffermyre withdrew the Anderson opinions and summarily reinstated the 2021 Jorjani opinion (*supra*) as "binding and authoritative" upon Interior. *See* Solicitor's Opinion, William L. Doffermyre, M-37087 (Feb. 24, 2026).[17] The Solicitor found

---

[15] Available at https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-alaskas-extraordinary-resource-potential/

[16] Available at https://www.doi.gov/sites/default/files/documents/2025-03/m-opinion-suspension-review0.pdf.

[17] Available at https://www.doi.gov/sites/default/files/documents/2026-02/m37087-permanent-withdrawl-m37076-and-reinstatement-m37064-02242026.pdf.

that opinions "M-37076 and M-37043 conflict with over five decades of consistent policy and legal determinations regarding the Secretary's land-into-trust authority in Alaska." Based on a "thorough examination of the issue," the Solicitor reaffirmed Solicitor Jorjani's determination that the legal analysis of those opinions is "insufficient" to support a determination that Interior has authority to take land in trust for tribes in Alaska. *Id.*

## SUMMARY OF ARGUMENT

Under *Alsea Valley* and related longstanding precedent of this Court, district court orders vacating agency decisions and remanding for further administrative review are not final for purposes of appellate review. There is an exception to this rule, but it applies only when the district court decision conclusively resolves a separable issue of law and compliance with the remand order, as a practical matter, will foreclose future appellate review of that issue. Those prerequisites are not satisfied here. The district court issued a final opinion on Interior's authority to take land into trust in Alaska. But that opinion will be subject to appeal later in this case, if, after completing the remand, Interior reaffirms its decision to take the Juneau parcel into trust. Conversely, if Interior denies the Tribe's application and the Tribe does not appeal, foreclosing the opportunity for an appeal in this case, the district court's opinion will not be binding against the State in future cases, due to

27

the unavailability of an appeal here. For these reasons, the general rule of *Alsea Valley* applies, and the State's appeal must be dismissed.

Earlier in this case, when the Tribe moved to dismiss the State's appeal for lack of appellate jurisdiction (which motion this Court denied without prejudice), the State argued that future (post-remand) appellate review cannot be guaranteed here, because the Tribe has not moved to dismiss its own cross-appeal, which calls for the reversal of the district court's remand order. But under *Alsea Valley*, this Court also lacks jurisdiction over the Tribe's cross-appeal. And the Tribe has since clarified that it will dismiss its appeal if the State's appeal is dismissed for lack of jurisdiction.

In response to the Tribe's motion to dismiss, the State also argued that future appellate review is not guaranteed here, because the Tribe could assert its sovereign immunity and move under Federal Rule of Civil Procedure 19 to dismiss any future State suit challenging any decision by Interior to take land into trust for the Tribe. This concern is well founded in recent precedent from this Court (with which the United States disagrees). But the Tribe waived any sovereign immunity defense in the present case, which waiver should extend to any direct appeal in this case, when it first becomes available under the *Alsea Valley* rule. The potential impact of this Court's Rule 19 precedent in other cases—i.e., in proceedings on different land-in-trust applications by the Tribe or by other tribes in Alaska—is a

28

matter for those future cases. This Court should not presume that Rule 19 and assertions of tribal sovereign immunity will foreclose future judicial review of any future Interior land-into-trust decision. Whether a tribe is a "required" party to a suit and whether a suit, in equity and good conscience can proceed without the tribe, are fact-bound determinations dependent on the unique circumstances of each case. Rule 19 considerations are too speculative and too far removed from finality concerns to control the issue of appellate jurisdiction here.

## STANDARD OF REVIEW

This Court determines its appellate jurisdiction de novo. *Renteria-Hinojosa v. Sunsweet Growers, Inc.*, 150 F.4th 1076, 1085 (9th Cir. 2025). This Court reviews a district court's grant of summary judgment de novo, applying the same standard of review under the APA employed by the district court. *See Corrigan v. Haaland*, 12 F.4th 901, 906 (9th Cir. 2021).

## ARGUMENT

**I.   This Court lacks jurisdiction over the State's appeal.**

**A.   Orders vacating and remanding agency decisions generally are not final for appeal purposes.**

Under longstanding precedent of this Court, a district court judgment setting aside agency action and remanding for further administrative proceedings "generally [is] not considered final" for purposes of appeal under 28 U.S.C. § 1291. *Center for Biological Diversity*, 69 F.4th at 594 (citing *Alsea Valley*, 358

F.3d at 1184); *see also Chugach Alaska Corp. v. Lujan*, 915 F.2d 454, 457 (9th Cir. 1990).  This is so even if the judgment formally terminates the district court action.  *See Pit River Tribe v. U.S. Forest Service*, 615 F.3d 1069, 1076 (9th Cir. 2010) (applying *Alsea Valley* rule even though "any judicial action following remand [would] be commenced by filing a new complaint initiating a new federal district court case").

Here, the district court's remand order was nominally final in the sense that the district court did not retain jurisdiction over Alaska's suit pending further administrative proceedings on the Tribes' application.  *See* 1-ER_41 (directing entry of "final judgment").  But the district court's vacatur-and-remand order leaves no final agency action and does not finally resolve Alaska's claims.  If Interior determines on remand that the Tribe was "under Federal jurisdiction" in 1934 or 1936 (when the IRA and Alaska IRA were enacted) and is thus eligible for a trust acquisition, and if Interior again grants the Tribe's application to take the Juneau parcel into trust, there will be a new final agency action subject to a challenge by Alaska.  *See* 5 U.S.C. §§ 702, 706.  If the State persists in its challenge and the district court affirms Interior's decision, Alaska may then raise all its objections in a single appeal.  "Until such contingencies have played out," appellate review is premature.  *See Alsea Valley*, 358 F.3d at 1185.  This finality

rule avoids potentially unnecessary and piecemeal appellate review. *Id.* at 1184-85. [18]

**B.    The exception to the remand-order rule does not apply.**

Under an exception to the above rule, an immediate appeal may be brought from an order vacating and remanding an agency decision when: "(1) the district court conclusively resolves a separable legal issue, (2) the remand order forces the agency to apply a potentially erroneous rule which may result in a wasted proceeding, and (3) review would, as a practical matter, be foreclosed if an immediate appeal were unavailable." *Center for Biological Diversity*, 69 F.4th at 594 (quoting *Collord*, 154 F.3d at 935).  But these circumstances ordinarily exist only for appeals by agencies. *See Alsea Valley*, 358 F.3d at 1184.  An agency compelled by a remand order to "refashion" a rule faces the "unique prospect" of being "deprived of [appellate] review altogether" if immediate review is denied, because an agency "cannot [challenge] the result of its own decision" on remand.

---

[18] Two judges of this Court have called for reconsideration of the *Alsea Valley* rule, on the view that that an order setting aside agency action is the "functional equivalen[t]" of an injunction, which can have potentially significant consequences during remand proceedings. *See Center for Biological Diversity*, 69 F.4th at 597-601 (Friedland and Bennett, JJ, concurring).  Here, however, Alaska sought vacatur of Interior's decision.  Although the district court did not grant vacatur on all grounds urged by Alaska, the district court's judgment will have no adverse consequences to Alaska unless Interior reaffirms its decision on remand, in which case Alaska may reinstate its challenge and appeal, including on those issues the district court resolved against Alaska.

*See Alsea Valley*, 358 F.3d at 1184-85. In contrast, a non-agency litigant generally will be able to challenge any new final agency action and to appeal any adverse decision in such a suit. *Id.*

This Court has determined that "there may be circumstances that would afford a non-agency litigant the ability to appeal a remand order." *Id.* at 1184; *see also Crow Indian Tribe v. United States*, 965 F.3d 662, 675-676 (9th Cir. 2020) (allowing non-agency intervenor defendant to appeal part of a remand order not appealed by the agency). But any prospective appellant from a remand order must show that all three prerequisites are met. *Id.* Here, the exception's first and third prerequisites are not satisfied.

In holding that Interior retains authority (post-ANCSA) to take land into trust for tribes in Alaska, *see* 1-ER_26-31, the district court reached "a separable legal issue." *See Collard*, 154 F.3d at 935. But the district court did not "conclusively resolve" that issue against the State. *Id.* In its suit, Alaska raised three arguments for vacatur: (1) that Interior lacks authority, post-ANCSA, to take land into trust for tribes in Alaska; (2) that the Tlingit and Haida Tribes are ineligible for to any trust acquisition under the IRA and Alaska IRA because they were not "under Federal jurisdiction" in 1934 or 1936; and (3) that Interior acted arbitrarily and contrary to ANCSA in citing land "restoration" as a reason for taking the Juneau parcel into trust. *See* 2-ER_110-112. The district court vacated

Interior's decision for further proceedings relating to the latter two claims.
1-ER_31-41.  In so doing, the district court did not need to resolve whether Interior
retains authority to take land into trust for tribes in Alaska, and the court's opinion
will not prevent the State from asserting its position in a future appeal or future
case.

To be clear, in its memorandum and order, the district court expressly found
that Interior "has the authority to take lands into trust in Alaska pursuant to IRA
§ 5, made applicable to Alaska through Alaska IRA § 1."  1-ER_26-31.  If Interior
reaffirms its decision to take the Juneau parcel into trust and Alaska again
challenges that decision, the district court's opinion could control those future
*district court* proceedings.  *See Musacchio v. United States*, 577 U.S. 237, 245
(2016) ("[W]hen a court decides upon a rule of law, that decision should continue
to govern the same issues in subsequent stages in the same case.")  But the district
court's ruling will not bind this Court in any future appeal. "The law of the case
applies . . . only to decisions by the same or a higher court."  *Buck v. Berryhill*, 869
F.3d 1040, 1050 (9th Cir. 2017); *accord In re Williams Sports Rentals, Inc.*, 90
F.4th 1032, 1039 (9th Cir. 2024).

Nor is an immediate appeal required, as a practical matter, to ensure the
availability of appellate review. *See Collard*, 154 F.3d at 935.  Solicitor
Doffermyre's decision to reinstate the 2021 Jorjani opinion increases the likelihood

33

that Interior, on remand, will deny the Tribe's present petition to take the Juneau parcel into trust.  In that event, and if the Tribe does not challenge the denial, the State will have no opportunity, in this case, to bring an appeal challenging Interior's trust-acquisition authority.  But the State will suffer no injury from the district court's opinion (that Interior retains trust-acquisition authority in Alaska) unless and until Interior again exercises that authority for the Tribe or for some other Alaska tribe.

Moreover, dismissing the State's current appeal, for lack of appellate jurisdiction, will not prevent the State from challenging Interior's trust-acquisition authority in future cases.  Because "collateral estoppel does not apply to an unappealable determination," a ruling by this Court dismissing the State's appeal for lack of finality would "eliminate[] any prospect of [issue] preclusion."  *See Environmental Protection Information Center, Inc. v. Pacific Lumber Co.*, 257 F.3d 1071, 1076 (9th Cir. 2001) (quoting *Sea-Land Serv., Inc. v. Dep't. of Transp.*, 137 F.3d 640, 648 (D.C. Cir. 1998)).

In short, because Alaska will have the opportunity to challenge any future decision by Interior to take land into trust for the Tribe or for any other Alaksa tribe, and because the district court's ruling on Interior's trust acquisition authority will not bind this Court in any future challenge and appeal, the district court's

judgment—which vacates and remands Interior's decision on the basis of Alaska's other claims—is not a final judgment for purposes of appeal by the State.

### C. The State's arguments on the potential non-availability of future appellate review are misplaced.

In response to the Tribe's motion to dismiss the State's appeal for lack of appellate jurisdiction, *see* Central Council of Tlingit & Haida Indian Tribes' Motion to Dismiss, DktEntry 30.1 (Feb. 28, 2025), Alaska argued that future appellate review cannot be "guaranteed"—and, therefore, that the *Alsea Valley* exception applies—for two reasons: (1) because the Tribe has not moved to dismiss its cross-appeal, *see* State of Alaska's Opposition to Central Council of Tlingit & Haida Indian Tribe's Motion To Dismiss, DktEntry 40.1, at 10-11 (June 25, 2025) ("Alaska's Opposition"); and (2) because the Tribe or any other Alaska tribe could assert an objection to future judicial review under Federal Rule of Civil Procedure 19 ("Rule 19"), *see id.* at 11-16. While Alaska's concerns are not unfounded, they are ultimately misplaced.

### 1. This Court lacks jurisdiction over the Tribes' appeal.

If this Court declines to hear the State's appeal for lack of appellate jurisdiction, but decides to hear the Tribe's cross-appeal, an appellate decision in favor of the Tribe and reversing the district court's remand order would reinstate Interior's trust-acquisition decision and eliminate the need for further proceedings in district court. Because the district court has already heard and rejected the

35

State's claim that Interior lacks authority to take land into trust for tribes in Alaska, the only task then remaining for the district court would be to enter a final judgment against the State on all its claims. Contrary to Alaska's argument, however, *see* Alaska's Opposition, DktEntry 40.1, at 10, this eventuality would not necessarily foreclose an appeal by Alaska. *See Collord*, 154 F.3d at 935. Rather, there would be a new final judgment adverse to the State, which the State could then appeal. But following this procedure (hearing the Tribe's cross-appeal without the State's appeal) would be in tension with the goals of the finality rule (promoting judicial efficiency), if this Court's resolution of the Tribe's cross-appeal were to lead directly to a second appeal by the State. *Cf. Alsea Valley*, 358 F.3d at 1184-85.

Ultimately, however, the above considerations are not germane here because there is no basis for this Court to hear either appeal. The Tribe's appeal faces the same finality obstacles as the State's appeal. *See Alsea Valley*, 358 F.3d at 1184-85. While the district court's judgment vacates a land-into-trust decision favorable to the Tribe and requires further proceedings on the Tribe's application, it does not dictate the outcome of the administrative proceedings. On remand, Interior could reaffirm its decision to take the Juneau parcel into trust in a manner consistent with the district court's opinion. In that event, the Tribe's cross-appeal would "prove entirely unnecessary." *See Alsea Valley*, 358 F.3d at 1185. Conversely, if on

remand Interior denies the Tribe's land-into-trust application, that adverse decision will be subject to challenge and potential appeal on any grounds preserved by the Tribe, including as to matters decided in the district court's present remand order. For these reasons, the district court's remand order is not final for purposes of the State's appeal or the Tribe's cross-appeal. *See Alsea Valley*, 358 F.3d at 1184-85.

Moreover, in briefing its motion to dismiss, the Tribe advised this Court that it will dismiss its cross-appeal if the Court dismisses the State's appeal. *See* Central Council of Tlingit & Haida Indian Tribes Reply in Support of the Tribe's Motion to Dismiss, DktEntry 44.1 (July 18, 2025). Because the Tribe has made its cross-appeal contingent on the State's appeal, this Court need not consider whether an appeal might be available to the Tribe alone. Because this Court lacks appellate jurisdiction over the State's appeal, both the appeal and contingent cross-appeal should be dismissed.

### 2. Rule 19 and tribal sovereign immunity do not foreclose a later appeal by the State.

The State's reliance on Rule 19 is also misplaced. That rule mandates the dismissal of any federal action if the court determines, "in equity and good conscience," that the suit cannot proceed in the absence of a "required" party. *See* Fed. R. Civ. P. 19. In several cases, this Court has affirmed the dismissal of APA claims that implicate the interests of a nonparty Native American tribe, where this Court has found the tribe to be a required party that cannot be joined due to tribal

sovereign immunity. *See*, *e.g.*, *Maverick Gaming LLC v. United States*, 123 F.4th 960, 972-83 (9th Cir. 2024); *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 943-47 (9th Cir. 2022); *Diné Citizens v. Bureau of Indian Affairs*, 932 F.3d 843, 851 (9th Cir. 2019). In the present case, the Tribe moved, without opposition from the State, to intervene as a party defendant in the State's action, to defend Interior's trust-acquisition decision on the merits. 2-ER_547 (Dkts. 6, 8). The Tribe did not bring a Rule 19 motion or raise tribal sovereign immunity. The State is concerned, however, that the Tribe could bring a Rule 19 dismissal motion based on tribal sovereign immunity in future litigation. *See* Alaska's Opposition, or in DktEntry 40.1, at 11.

If the district court were to grant such a motion in a future case, and if this Court were to affirm, that Rule 19 decision would prevent the Court from hearing the State's challenge to Interior trust acquisition authority. *Id.* Nonetheless, the possibility of such a dismissal in a future case does not show that appellate review, "as a practical matter," "would . . . be foreclosed" if Alaska is denied an immediate appeal in the *present* case. *See Collord*, 154 F.3d at 935.

In the present case, by moving to intervene as a party defendant on the merits of the State's action, the Tribe consented to joinder and waived any sovereign immunity defense. A tribe does not automatically waive sovereign immunity with respect to counterclaims when bringing an affirmative suit. *See*

38

*Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1017 (9th Cir. 2016). But here, the Tribe voluntarily joined the State's suit to defend Interior's decision on the merits. This is an "unequivocal" waiver of sovereign immunity as to the State's suit. *See id.* at 2016.

In seeking an immediate appeal from the district court's remand order under the *Alsea Valley* exception, the State presumes that the Tribe's waiver of sovereign immunity extends to its present appeal but that such waiver will not extend to a future challenge and appeal by the State after the remand proceedings dictated by the district court. This presumption is contrary to *Alsea Valley*'s rationale. Under *Alsea Valley*, the district court's ruling on Interior's trust authority is not subject to appeal under 28 U.S.C. § 1291, because the court's vacatur-and-remand order does not finally resolve Alaska's claims in this case. *See Alsea Valley*, 358 F.3d at 1184-85. If, on remand, Interior reaffirms its decision to take the Juneau parcel into trust and that decision is upheld by the district court, there will then be a final decision subject to appeal by Alaska. *Id.* If the Tribe's waiver applies to all stages of the present litigation, including any direct appeal by Alaska, the waiver should apply when the litigation is complete in district court, and a direct appeal first becomes available under *Alsea Valley*.

To be sure, there is a significant possibility, given this Court's Rule 19 precedent, that the Tribe or another Alaska tribe might bring a Rule 19 motion in

some *different* case.  As explained (*supra*, pp. 33-34), if, on remand, Interior denies the Tribe's application to take the Juneau parcel into trust and the Tribe does not challenge that denial, the State will have no opportunity to bring an appeal on the issue of Interior's trust authority as part of this case (i.e., the combined administrative and judicial proceedings on the Tribe's application regarding the Juneau parcel).  This would leave the question of Interior's trust-acquisition authority for resolution in some future suit, assuming Interior again decides to take land into trust for an Alaska tribe.  If the tribal beneficiary of such a decision raises a Rule 19 objection to a challenge by the State, there is a prospect that a future land-into-trust decision could be shielded from judicial review.

But in that scenario, the barrier to judicial review (if any) would be this Court's Rule 19 jurisprudence as applied in that future case.  This Court should not hear an immediate appeal from the nonfinal decision in this case—contrary to *Alsea Valley*—simply because the issue the State seeks to litigate (Interior's authority to take land into trust for tribes in Alaska) might become relevant in some future suit in which judicial review is not guaranteed for a reason unrelated to finality.

Moreover, this Court should not presume that Rule 19 will preclude review of future land-into-trust decisions by Interior.  The United States has long maintained that the only required party in a suit under the APA is the agency

whose action is being challenged. *See Maverick Gaming LLC*, 123 F.4th at 984-85 (Miller J., concurring) (outlining argument).[19] Although this Court has not adopted that view, *see id.* at 983-84 (summarizing precedent), there are unique considerations in APA cases that weigh against finding the beneficiaries of regulatory action to be "required" parties, *id.* at 984-85. In addition, this Court has acknowledged that Rule 19 analyses are "heavily influenced by the facts and circumstances of each case." *See Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. California*, 547 F.3d 962, 970 (9th Cir. 2008) (quoting *Bakia v. County of Los Angeles*, 687 F.2d 299, 301 (9th Cir.1982)).

This Court has never held that a beneficiary tribe is a required or indispensable party in a suit challenging a land-into-trust decision. The Eighth Circuit has reached the opposite conclusion. *See Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1258-1260 (8th Cir. 2001). This Court has heard multiple appeals in cases involving challenges to land-into-trust decisions where Rule 19 objections have not been raised. *See Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. Zinke*, 889 F.3d 584 (9th Cir. 2018); *County of*

---

[19] The United States view is also set out at U.S. Brief in Opposition, *Maverick Gaming LLC v. United States*, No. 24-1161 (Aug. 27, 2025); U.S. Brief in Opposition, *Klamath Irrigation Dist. v. Bureau of Reclamation*, No. 22-1116 (Sept. 27, 2023), U.S. Amicus Brief, *Diné Citizens v. Bureau of Indian Affairs*, No. 17-17320, 2018 WL 948523 (9th Cir. Feb. 16, 2018).

*Amador v. United States Department of Interior*, 872 F.3d 1012 (9th Cir. 2017); *see also Carcieri*, 555 U.S. 379 (same). And the "public-rights doctrine" provides an exception to Rule 19 joinder that is properly applied in cases challenging land-into-trust decisions. *See Federated Indians of Graton Rancheria v. U.S. Dept' of the Interior*, Slip Op., 2025 WL 2096161 *8 (July 18, 2025) (N.D. Cal. No. 24-cv-08582-RFL) (appeal pending, 9th Cir. No. 25-4604).

This is not to argue that this Court should prejudge a hypothetical Rule 19 motion that might be raised by the beneficiary tribe in a future suit by the State challenging a decision by Interior to take land into trust in Alaska. But the United States believes that Rule 19 should not provide an obstacle to such a suit. And the success of a Rule 19 motion in such a suit is not guaranteed. At bottom, although the State's concerns about a potential Rule 19 dismissal are well founded in this Court's precedents, the State's arguments regarding Rule 19 are too speculative to control the question of appellate jurisdiction in this case.

## II. Interior has reinstated its position against taking land into trust for tribes in Alaska.

As explained (pp. 23-24, supra), in his 2022 decision to take the Juneau parcel into trust for the Tribe, then Assistant Secretary Newland relied on a 2022 M-Opinion issued by then Solicitor Anderson, which departed from the 2021 M-Opinion of prior Solicitor Jorjani. In January 2025, the Trump Administration suspended the Anderson opinion pending review. Solicitor Doffermyre has now

withdrawn the Anderson opinion and reinstated the Jorjani opinion, returning the Department to its view of the "legal uncertainty and questions of appropriate Department policy" regarding Interior's trust-acquisition authority in Alaska.  *See* p. 21, *supra*.  Given Interior's changed position on its authority take land into trust for tribes in Alaska, and the district court's judgment vacating the land-into-trust decision in this case and sending the matter back to Interior, appellate review is premature.  This Court should follow the settled rule in *Alsea Valley* and decline to hear Alaska's appeal while Interior reconsiders the Tribe's application pursuant to the district court's remand order and the new Solicitor's opinion.

## CONCLUSION

For the foregoing reasons, the district court should dismiss Alaska's appeal and the Tribe's conditional cross-appeal for lack of jurisdiction.

ADAMIN R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

Of counsel:

ROBERT HITCHCOCK
JOHN HAY
Solicitor's Office
U.S. Department of the Interior

/s/ *John L. Smeltzer*

CHARMAYNE STALOFF
JOHN L. SMELTZER
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, DC  20044
(202) 305-0343
john.smeltzer@usdoj.gov

February 25, 2026
D.J. No. 90-6-21-01185

**STATEMENT OF RELATED CASES**

Undersigned counsel is unaware of any related cases currently pending in this court.

/s/ *John L. Smeltzer*

JOHN L. SMELTZER
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, DC  20044
(202) 305-0343
john.smeltzer@usdoj.gov

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Nos. 23-15499, 23-15521**

I am the attorney or self-represented party.

This brief contains **10,129** words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[√] complies with the word limit of Cir. R. 32-1 and 32-2(b).

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**   s/ *John L. Smeltzer*

**Date**  February 25, 2026