**Nos. 24-5280 & 24-5285**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATE OF ALASKA,
*Plaintiff-Appellant/Cross-Appellee*,

v.

WILLIAM KIRKLAND, et al.,
*Defendants-Appellees*,

v.

CENTRAL COUNCIL OF TLINGIT & HAIDA INDIAN TRIBES OF ALASKA,
*Intervenor-Defendant-Appellee/Cross-Appellant*.

On appeal from the U.S. District Court
for the District of Alaska, Anchorage
Case No. 3:23-CV-00007-SLG
Hon. Sharon L. Gleason

## STATE OF ALASKA'S COMBINED RESPONSE AND REPLY BRIEF

STEPHEN J. COX
Attorney General

Jessica M. Alloway
Deputy Solicitor General
Alaska Department of Law
1031 West Fourth Ave, Suite 200
Anchorage, AK 99501
(907) 269-6612
jessie.alloway@alaska.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... 4

INTRODUCTION ........................................................................................... 9

SUMMARY OF ARGUMENT ....................................................................... 10

ARGUMENT ................................................................................................. 15

I.    The State has standing, and this Court has jurisdiction over the State's appeal.......................................................................................... 15

    A.    The State has standing to appeal. ...................................... 15

    B.    The Court has jurisdiction over the State's appeal and the Tribe's "conditional" cross-appeal. ............................................. 18

II.    The district court erred in holding the Secretary retains broad discretionary authority to acquire lands in trust for Alaska tribes post-ANCSA.............. 28

    A.    The State's argument is one of statutory construction, not implied repeal. ...................................................................... 28

    B.    The Tribe's plain text argument proves too little............................ 37

    C.    The post-ANCSA statutory scheme confirms the State's reading... 40

    D.    The State's Metlakatla concession confirms, rather than undermines, its reading. ...................................................................... 47

    E.    The major question doctrine applies. ................................................ 48

    F.    Trust land for a tribe is Indian country regardless of whether a reservation proclamation accompanies it. ....................................... 50

III.    The district court correctly vacated Interior's decision on other grounds, and the Tribe's cross-appeal should be denied............................................ 51

    A.    The Alaska clause in § 5129 is not a standalone definition that exempts Alaska tribes from the "under Federal jurisdiction" requirement...................................................................... 53

        1.    *Carcieri* does not resolve this issue in the Tribe's favor............................................................................... 53

2.    The district court correctly read § 5129. ...................................54

B.    The district court correctly found the restoration rationale arbitrary and capricious. ...................................................................................59

1.    The harmless error doctrine does not apply here........................59

2.    The townsite characterization does not rescue the restoration rationale. .................................................................65

CONCLUSION ...........................................................................................68

## TABLE OF AUTHORITIES

**Cases**

*Akiachak Native Cmty. v. U.S. Dep't of Interior*,
827 F.3d 100 (D.C. Cir. 2016) ................................................................25

*Alaska v. Native Village of Venetie Tribal Gov't*,
522 U.S. 520 (1998)................................................24, 38, 41, 42, 62

*Alaska v. Nat'l Marine Fisheries Serv.*,
171 F.4th 1145 (9th Cir. 2026)................................................18, 20

*Alsea Valley Alliance v. Department of Commerce*,
358 F.3d 1181 (9th Cir. 2004)................................11, 15, 19, 22, 23

*Am. Stewards of Liberty v. Dep't of Interior*,
960 F.3d 223 (5th Cir. 2020)................................................................17

*Biden v. Nebraska*,
600 U.S. 477 (2023)................................................................29

*Carcieri v. Salazar*,
555 U.S. 379 (2009)................................................................*passim*

*Chugach Alaska Corp. v. Lujan*,
915 F.2d 454 (9th Cir. 1990)................................................................21

*Cohens v. Virginia*,
19 U.S. 264 (1821)................................................................54

*Collord v. U.S. Dep't of Interior*,
154 F.3d 933 (9th Cir. 1998)................................................................21

*Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*,
228 F.3d 82 (2d Cir. 2000)................................................44, 45, 46

*Crow Indian Tribe v. United States*,
965 F.3d 662 (9th Cir. 2020)................................................................27

*Ctr. for Biological Diversity v. BLM*,
69 F.4th 588 (9th Cir. 2023)................................................20, 26, 27

*Deschutes River All. v. Portland Gen. Elec. Co.*,
1 F.4th 1153 (9th Cir. 2021)................................................................21

*Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*,
932 F.3d 843 (9th Cir. 2019)................................................................22

*E.E.O.C. v. Peabody W. Coal Co.*,
    773 F.3d 977 (9th Cir. 2014)..................................................................30

*Elec. Fittings Corp. v. Thomas & Betts Co.*,
    307 U.S. 241 (1939)...........................................................................16

*Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*,
    257 F.3d 1071 (9th Cir. 2001)..................................................15, 16, 17

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)...................................................................*passim*

*Federated Indians of Graton Rancheria v. U.S. Dep't of the Interior*,
    No. 25-4604 (9th Cir.) ...................................................................26, 68

*Forney v. Apfel*,
    524 U.S. 266 (1998)......................................................................16, 17

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)...........................................................................49

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)...........................................................................38

*Jamul Action Comm. v. Simermeyer*,
    974 F.3d 984 (9th Cir. 2020)..........................................................22, 24

*Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*,
    48 F.4th 934 (9th Cir. 2022)................................................................21

*Kreider Dairy Farms, Inc. v. Glickman*,
    190 F.3d 113 (3d Cir. 1999)................................................................16

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)...........................................................................58

*Lotus Vaping Tech., LLC v. U.S. Food & Drug Admin*,
    73 F.4th 657 (9th Cir. 2023)................................................................65

*Maverick Gaming LLC v. United States*,
    123 F.4th 960 (9th Cir. 2024)........................................................21, 24

*McClendon v. United States*,
    885 F.2d 627 (9th Cir. 1989)..............................................................22

*Morton v. Mancari*,
    417 U.S. 535 (1974)...........................................................................28

*Motor Vehicle Mfr. Ass'n of the United States v. State Farm Mutual*,
    463 U.S. 29 (1983).................................................................34, 62, 64

*Native Village of Eyak v. Blank*,
688 F.3d 619 (9th Cir. 2012) (en banc)........................................................67

*Nebraska v. Parker*,
577 U.S. 481 (2016).........................................................................................38

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024)........................................................................48, 49

*Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*,
498 U.S. 505 (1991).........................................................................................50

*Santa Rosa Band of Indians v. Kings County*,
532 F.2d 655 (9th Cir. 1975)...........................................................................50

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)...................................................................14, 59, 60, 67

*Seminole Tribe of Florida v. Florida*,
517 U.S. 44 (1996).........................................................................................23

*Sierra Forest Legacy v. Sherman*,
646 F.3d 1161 (9th Cir. 2011)........................................................................18

*Traynor v. Turnage*,
485 U.S. 535 (1988).........................................................................................37

*United States v. Jose*,
519 U.S. 54 (1996) (*per curiam*) ...................................................................16

*United States v. Good Samaritan Church*,
29 F.3d 487 (9th Cir. 1994)............................................................................16

*United States v. Rogers*,
45 U.S. 567 (1846)...........................................................................................55

*United States v. U.S. Bd. of Water Comm'rs*,
893 F.3d 578 (9th Cir. 2018)..........................................................................18

*U.S. v. Fletcher*,
805 F.3d 596 (5th Cir. 2015)..........................................................................17

*West Virginia v. EPA*,
597 U.S. 697 (2022)..................................................................................48, 49

**Federal Statutes**

18 U.S.C. § 1151(a)..........................................................................................51

6

25 U.S.C. § 2219(b) ...................................................................................42

25 U.S.C. § 2219(c) ...................................................................................42

25 U.S.C. § 5108 ................................................................................*passim*

25 U.S.C. § 5110 ................................................................................*passim*

25 U.S.C. § 5119 ..............................................................11, 13, 36, 37, 47

25 U.S.C. § 5129..................... 13, 51, 52, 53, 54, 55, 56, 57, 59

43 U.S.C. § 1601(b) ...............................................................33, 34, 35, 45

43 U.S.C. § 1603 .........................................................................33, 45, 63, 67

43 U.S.C. § 1603(b) ...................................................................................63

43 U.S.C. §§ 1605, 1606 ...........................................................................33

43 U.S.C. § 1618(a) ......................................................33, 36, 45, 47, 67

43 U.S.C. § 1629e .................................................................................34, 42

## Federal Regulations

25 C.F.R. § 151.2(f) (2022)........................................................................62

25 C.F.R. § 151.3(a)(3) ...............................................................................64

25 C.F.R. § 151.11(b) (2022) ........................................................59, 60, 61

25 C.F.R. § 151.11(b)(1) .............................................................................66

25 C.F.R. § 151.11(b)(8) (2024) ............................................................14, 60

25 C.F.R. § 151.11(d) (2022) .....................................................................60

25 C.F.R. § 151.12 (2024)......................................................14, 62, 63

25 C.F.R. § 151.12(b)...................................................................................64

25 C.F.R. § 151.12(b)(6) .............................................................................63

25 C.F.R. § 151.12(b)(8) .............................................................................63

25 C.F.R. § 151.12(c) (2024) ......................................................................64

Land Acquisitions, 45 Fed. Reg. 62,034, 62,036 (Sept. 18, 1980).........................39

Land Acquisitions, 88 Fed. Reg. 86,222 (Dec. 12, 2023)................................60, 62

## Legislative History

78 Cong. Rec. 11830 (June 15, 1934)........................................................55, 56, 59

**Session Laws**

Act for the Protection and Regulation of the Fisheries of Alaska,
    48 Stat. 594 (1934) ..................................................................56

Act to Establish an Alaska Game Commission, 52 Stat. 1169, § 2 (1938) .............56

Alaska Native Allotment Act,
    Act of May 17, 1906, ch. 2469, 34 Stat. 197 (1906)...............................55, 56

Alaska Native Townsite Act, Pub. L. No. 69-280, Ch. 379. 44 Stat. 629 (1926)....56

Alaska Statehood Act, Pub. L. 85-508, § 4, 72 Stat. 339 (1958)...........................56

Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (1976) ....................................33

Pub. L. No. 96-420, § 5(e), 94 Stat. 1785, 1791 (1980) .........................................45

Pub. L. No. 96-420, § 16(b), 94 Stat. at 1795 (1980)..............................................45

Pub. L. No. 117-103, subtit. B., §§ 811–13, 136 Stat. 49, 904–10 (2022) .............42

Reindeer Industry Act, § 15, 50 Stat. 900 (1937) ...................................................56

**Court Rule**

Federal Rule of Civil Procedure 19 ...........................................11, 17, 21, 24, 26, 68

**Other Authorities**

*Section 4(c)(2)(C) Response of the Departments of Justice and the Interior to Not
    One More*: Findings and Recommendations of the Not Invisible Act
    Commission, Pursuant to Public Law 116-166 ............................................39

8

## INTRODUCTION

In November 2022, the Department of the Interior took a 787-square-foot parking lot in Juneau into trust for the Central Council of Tlingit & Haida Indian Tribes of Alaska with the intent to declare it a reservation. 1-ER-126–27. The district court vacated that decision on two independent grounds: Interior failed to determine whether the Tribe was "under Federal jurisdiction" when the Indian Reorganization Act was enacted and Interior's "restoration of Indian lands" justification was arbitrary and capricious because it rested on aboriginal title Congress extinguished fifty years ago through the Alaska Native Claims Settlement Act. The State appeals the district court's erroneous conclusion that Interior retains broad discretionary authority to acquire land in trust throughout Alaska. The Tribe cross-appeals both vacatur grounds.

The Tribe reframes this case as one about implied repeal. The State is not making that argument. The State concedes the Secretary retains trust acquisition authority for the Metlakatla Indian Community—the one tribe whose reservation Congress expressly preserved. The State's argument is more precise: *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) asks what a grant of authority encompasses when read considering the full statutory scheme built around it. When Congress enacted a comprehensive settlement that revoked nearly all Alaska reservations, extinguished all aboriginal title, declared a permanent

9

policy against reservation systems and lengthy trusteeships, and provided land and money through a mechanism specifically designed to avoid the federal wardship model, it confined the Secretary's broad trust acquisition authority to Metlakatla. The Tribe's implied repeal framing bypasses that question. This Court should not let it.

The cross-appeal fares no better. The district court correctly held that the standalone Alaska definition the Tribe invokes does not exist and that the restoration rationale was arbitrary and capricious. The Tribe's harmless error defense rests on a regulation that did not exist when the Secretary acted—and the problem runs deeper: Part 151's regulatory framework, in both its 2022 and 2024 versions, was built around conditions that post-ANCSA Alaska structurally lacks. The cross-appeal should be denied.

## SUMMARY OF ARGUMENT

**I. Jurisdiction and Standing.** Although the State prevailed on vacatur, it is aggrieved by the remand order and the district court's adverse legal ruling. The judgment harmed the State in three ways: the district court denied injunctive relief, embedded a controlling adverse legal conclusion in the remand order, and created conditions under which future appellate review will, as a practical matter, be foreclosed—a prospect Interior acknowledges (at 38, 52) is "well founded." [1] The

---

[1] Citations to the briefs are to the docketed page numbers.

10

remand order satisfies *Alsea Valley Alliance v. Department of Commerce*, 358 F.3d 1181 (9th Cir. 2004): it conclusively resolves a separable legal issue, risks a wasted proceeding, and forecloses practical review. The Tribe's sovereign immunity and Rule 19 precedent from this Court confirm that if this Court does not review the trust authority question now, the State may never obtain review.

**II. Trust Acquisition Authority.** The Tribe argues that the Alaska IRA's cross-reference (25 U.S.C. § 5119) to the lands into trust authority (25 U.S.C. § 5108) resolved the trust authority question in 1936 and nothing since has changed. *Brown & Williamson* forecloses that response: courts read statutes as coherent wholes, give effect to the policy embodied in later legislation, and ask what a grant of authority encompasses when read considering the full statutory scheme—not whether the earlier text technically survives.

The Alaska IRA's trust acquisition provisions served a specific and limited purpose. The IRA's remedial core—restoring lands broken up by the allotment policy—had no counterpart in Alaska. Then Secretary of the Interior Harold Ickes—who testified on behalf of the Alaska IRA—explained that §§ 5108 and 5110 were extended to Alaska as administrative machinery for a reservation program not yet established there. Over 35 years the Secretary created six reservations and took 31 acres into trust. Congress answered the broader land question through ANCSA—revoking all but one Alaska reservation, extinguishing

11

all aboriginal title, and providing 44 million acres through a mechanism designed to avoid the federal wardship model. FLPMA then repealed § 2 of the Alaska IRA—the reservation authority §§ 5108 and 5110 had been extended to Alaska to support.

The post-ANCSA legislative record confirms this reading. Congress addressed Alaska land policy repeatedly over four decades without once restoring trust acquisition authority—enacting each measure relying on Interior's consistent position that it lacked such authority. That is *Brown & Williamson's* ratification pattern. Interior's own internal analysis reaches the same conclusion: Solicitor Jorjani, after the most thorough review the agency has conducted, found the prior pro-authority opinions contained "numerous significant omissions" rendering their legal analysis "insufficient" to support the claimed authority. *See* Solicitor's Opinion, Daniel H. Jorjani, M-37064 (Jan. 19, 2021), 2-ER-188–224, *reinstated by* Solicitor's Opinion, William L. Doffermyre, M-37087 (Feb. 24, 2026).[2] The agency has changed its legal position four times in a decade, but what matters under *Brown & Williamson* is what position prevailed when Congress acted. Critically, every time Congress addressed Alaska land policy over those four

---

[2]     Available at https://www.doi.gov/sites/default/files/documents/2026-02/m37087-permanent-withdrawal-m37076-and-reinstatement-m37064-02242026.pdf.

decades, either the prevailing administration had formally concluded it lacked trust acquisition authority in Alaska—as it did from 1980 through 2017—or, when that conclusion was later questioned, Interior's own Solicitor found the legal basis for the claimed authority to be seriously insufficient. Either way, Congress was not legislating against a backdrop of settled, affirmed trust acquisition authority.

The correct harmonization of § 5119 with ANCSA limits the Secretary's trust acquisition authority to the Metlakatla Indian Community—the one tribe whose reservation Congress expressly preserved. That is not a concession that undermines the State's argument. It is the argument.

The major questions doctrine independently requires clearer authorization than a dormant cross-reference supplies. For 46 years following ANCSA, Interior maintained it lacked broad trust acquisition authority—a position that held across multiple administrations. Exercised at scale across 229 Alaska tribes comprising 39.5 percent of all federally recognized tribes, the claimed authority would produce a territorial sovereignty transformation and a patchwork of jurisdiction throughout the state that the doctrine requires Congress—not agencies—to authorize clearly.

**III. The Cross-Appeal.** The district court correctly held that 25 U.S.C. § 5129 contains no standalone Alaska definition exempting Alaska tribes from *Carcieri*'s "under Federal jurisdiction" requirement. The Supreme Court described § 5129 as containing "only three discrete definitions" of Indian. The Alaska clause

13

clarifies that Eskimos and Aleuts are "Indians" within those definitions—it is not a fourth independent pathway. Felix Cohen's contemporaneous statement that Alaska Natives must satisfy one of the three criteria confirms this reading. The Tribe's reliance on *Carcieri* footnote 6 treats a passing historical observation as a holding on a question not before the Court.

The restoration rationale was arbitrary and capricious. The Tribe's harmless error defense fails because it rests on 25 C.F.R. § 151.11(b)(8) (2024)—a provision that did not exist when the Secretary acted in November 2022. The Secretary quoted and applied the 2022 regulation, which contains no enumerated beneficial purposes and no "great weight" framework. Affirming a 2022 decision under a 2024 regulatory standard the Secretary never applied is precisely what *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) forbids.

The regulatory problem is structural. Both the 2022 and 2024 versions of Part 151 were built around conditions post-ANCSA Alaska lacks: existing reservations, tribal territorial jurisdiction, and the allotment-era history the regulations presuppose. The 2024 regulations added § 151.12 for tribes without reservations—but six of its eight enumerated purposes are structurally unavailable to Alaska tribes. The only broadly available purpose is the generic self-determination catch-all that has always nominally existed. That regulatory gap

14

reflects the fundamental uncertainty about whether trust acquisition authority exists in post-ANCSA Alaska that this litigation presents.

## ARGUMENT

### I. The State has standing, and this Court has jurisdiction over the State's appeal.

Although the State prevailed on its request for vacatur, it is aggrieved by the remand order and the district court's underlying legal ruling that the Secretary retains trust authority in Alaska. Without immediate review, future judicial review will, as a practical matter, be foreclosed—a prospect that even Interior (at 38, 52) acknowledges is "well founded." Alaska therefore has standing to appeal as an aggrieved party, and this appeal satisfies the narrow exception for appeals challenging an order vacating and remanding an agency decision. *See Alsea Valley Alliance v. Dep't of Com.*, 358 F.3d 1181 (9th Cir. 2004).

### A. The State has standing to appeal.

All agree that courts "review judgments, not statements in opinions" and that only aggrieved parties may "ordinarily" appeal from a judgment. *Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d 1071, 1075 (9th Cir. 2001) (cleaned up). The Tribe relies on this rule, arguing (at 38) that the Court "must" dismiss the State's appeal because the only parties aggrieved by the district court's judgment were the Tribe and Interior. Not so.

15

The judgment harmed the State in three ways. First, the State did not request remand—it argued that the Secretary lacks authority to take lands into trust and sought to prevent Interior from even considering the Tribe's application. 2-ER-113. That distinguishes this case from the cases the Tribe cites (at 36), in which the Court dismissed appeals because the contested decision had "no effect" on the appellant. *See Pacific Lumber Co.*, 257 F.3d at 1075; *United States v. Good Samaritan Church*, 29 F.3d 487, 488 (9th Cir. 1994). The district court's legal conclusion that the Secretary retains this authority "found its way into the judgment" via the remand order, and on review this Court may find it appropriate to "'direct reformation of the decree'" by instructing the district court to enter judgment in favor of the State. *See Good Samaritan Church*, 29 F.3d at 488 (quoting *Elec. Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242 (1939)).

Second, contrary to the Tribe's assertion (at 35), the State did not "receive[] precisely what it sought." The Supreme Court has "clearly stated" that a party is "'aggrieved'" by a decision "'granting in part and denying in part the remedy requested.'" *Forney v. Apfel*, 524 U.S. 266, 272 (1998) (quoting *United States v. Jose*, 519 U.S. 54 (1996) (*per curiam*)).[3] The State's complaint sought both vacatur

---

[3] The Third Circuit has held that *Forney* carved out a limited exception to the finality rule for remand orders. *See Kreider Dairy Farms, Inc. v. Glickman*, 190 F.3d 113, 119 (3d Cir. 1999). The State does not dispute that, and as explained *infra* at 18–28, its appeal satisfies this Court's finality requirement. Relatedly, the Fifth Circuit has held that *Forney's* application turns on the appellate court's

and a permanent injunction barring Interior from reissuing a land-into-trust decision. *See* 2-ER-113–14. Because the district court's judgment granted the first form of relief and denied the second, the State is harmed by that judgment and has standing to appeal. *See Forney*, 524 U.S. at 272.

Third, beyond the judgment, the district court's collateral ruling can also harm the State in future proceedings. When assessing prudential standing, this Court considers whether the district court's order "can" serve as the basis for collateral estoppel and whether "the circumstances of the case" render the appellant "aggrieved" for other reasons. *Pacific Lumber Co.*, 257 F.3d at 1076. A party has a cognizable interest in appealing an adverse legal ruling before that ruling forecloses future litigation—a concern this Court recognizes by considering collateral estoppel in this context. As discussed *infra* at 20–28, those same considerations apply with equal force here. Whether the State's claim is ultimately foreclosed by collateral estoppel, or by the combination of the Tribe's sovereign immunity and this Court's interpretation of Rule 19, the result should be the same:

---

authority to grant the relief requested. *See Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 231 (5th Cir. 2020). While courts cannot direct a specific agency action, *see id.*, they retain authority to enjoin an agency from engaging in unlawful action. When a district court denies a party complete relief, that party may appeal the denial. *See U.S. v. Fletcher*, 805 F.3d 596, 603 (5th Cir. 2015) ("In the ordinary case, the district court's decision to afford the Intervenors with some, but not all, of the relief requested might well be sufficient to allow the Intervenors to appeal." (citing *Forney*, 524 U.S at 271–72)).

before the district court's legal conclusion can bind the State in future litigation, the State must have an opportunity for appellate review.

The State is not appealing a statement it dislikes; it is appealing a judgment that harmed it in concrete, immediate, and prospective ways. That is precisely the situation appellate jurisdiction exists to address.

### B.     The Court has jurisdiction over the State's appeal and the Tribe's "conditional" cross-appeal.

The district court's order satisfies this Court's finality requirements. To be sure, remand orders are "generally" not considered final for purposes of appellate jurisdiction. *Alaska v. Nat'l Marine Fisheries Serv.*, 171 F.4th 1145, 1153 (9th Cir. 2026). "But that principle is not inviolate." *Id.* This Court's finality analysis looks to three "considerations": (1) whether the order "conclusively resolves a separable legal issue"; (2) whether application of the "potentially erroneous" ruling "may result in a wasted proceeding"; and (3) whether the denial of an immediate appeal would foreclose review "as a practical matter." *Id.* (quoting *United States v. U.S. Bd. of Water Comm'rs*, 893 F.3d 578, 594 (9th Cir. 2018)). And contrary to Interior's argument (at 42), while "each consideration bears weight, none is a 'strict prerequisite'" to the Court's jurisdiction. *Id.* (cleaned up) (quoting *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1175 (9th Cir. 2011)).

The State's appeal and the Tribe's cross-appeal satisfy each consideration and will save resources, not waste them.[4]

*First*, the district court's order resolves two separate legal issues. It held that the Secretary retained authority after ANCSA to take land into trust and that Alaska tribes must meet the full definition of "Indian" and "tribe" within the Indian Reorganization Act. 1-ER-31 & 37–38.

Interior argues (at 42) the district court did not "conclusively resolve" the authority issue because other grounds for vacatur remain open on remand. But conclusive resolution does not require that a ruling be the only possible basis for the ultimate outcome—it requires that the court have definitively decided a separable legal question. The district court did exactly that. It held, as a matter of law, that the Secretary retains authority post-ANCSA to take land into trust in Alaska, 1-ER-31 and that ruling will govern all subsequent district court proceedings as law of the case regardless of how the remand resolves. [*See*

---

4    The same considerations that establish the State's right to appeal now also establish the Tribe's right to pursue its cross-appeal. The Tribe cannot simultaneously argue that it has an immediate right to appellate review of the district court's rulings against it while contending that the State must wait. If the *Alsea Valley* factors support jurisdiction over the Tribe's cross-appeal—as the Tribe necessarily concedes by pursuing it—they support jurisdiction over the State's appeal for the same reasons.

Interior, at 43] A legal holding that binds future proceedings is, by definition, conclusively resolved. *See Nat'l Marine Fisheries Serv.*, 171 F.4th at 1155.

*Second*, assuming this Court disagrees with the district court on either of those two legal holdings, the agency will be forced to engage in a "wasted proceeding." If the State is correct, the remand need not occur at all—the Secretary lacks the discretion the Tribe seeks to invoke. On the other hand, if the State is incorrect and the Tribe is correct, then the agency does not need to reconsider whether it meets the full definition of Indian within the IRA—there is no dispute that the Tribe meets the "stand alone" definition that it advocates for.[5]

*Third*, if either the State or the Tribe are deprived of the opportunity to appeal now, their ability to pursue an appeal of these legal issues in the future could, "as a practical matter," be foreclosed. When evaluating this prong of the test, this Court reviews the possibility of future appellate review "from the perspective of the party attempting to appeal." *Ctr. For Biological Diversity v. BLM*, 69 F.4th 588, 594 (9th Cir. 2023). And the evaluation is not limited to whether the party can still obtain relief from the agency on remand; the Court must also assure itself that, in the event the agency did not provide the relief requested, the party can still "bring suit at that point to challenge the [agency's] action." *Id.*

---

[5] Should the Court rule in favor of the State in its appeal, then it does not need to resolve the Tribe's cross-appeal.

(internal quotation marks omitted); *see also Collord v. U.S. Dep't of Interior*, 154 F.3d 933, 935 (9th Cir. 1998) ("If fees are awarded to the Collords on remand, the Secretary cannot appeal his own agency's decision and review of the applicability of the EAJA to the proceeding might be foreclosed."); *Chugach Alaska Corp. v. Lujan*, 915 F.2d 454, 457 (9th Cir. 1990) ("Should the Secretary lose on remand, there would be no appeal, for the Secretary cannot appeal his own agency's determinations.").

This risk is not "too speculative" or "too far removed from finality concerns." [Interior, at 39] One might expect that, because an APA challenge runs only against the agency, a tribe could not wield sovereign immunity to block suit. *See Maverick Gaming LLC v. United States*, 123 F.4th 960, 984 (9th Cir. 2024) (Miller, J., concurring) (explaining that "the APA does not authorize relief against any party other than the agency"). But this Court has repeatedly held otherwise. There is a "'wall of circuit authority' requiring dismissal when a Native American tribe cannot be joined due to its assertion of tribal sovereign immunity." *Id.* at 971 (quoting *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 947 (9th Cir. 2022); *see also Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021) (holding that, under Rule 19, "[t]he Tribe's sovereign immunity requires dismissal of this suit, in which [plaintiff] challenges the operation of a large hydroelectric project co-owned and co-operated by the

21

Tribe, and located partly on the Tribe's reservation"); *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 997 (9th Cir. 2020) (Indian tribe required and indispensable party in suit challenging "the trust status of its land and . . . its status as a federally recognized tribe"); *Diné Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843 (9th Cir. 2019) (rejecting the United States's argument that the United States is generally the only indispensable defendant in APA litigation).

Interior's attempts to downplay the State's "well founded" concerns fall flat. It relies heavily on the fact that the Tribe "voluntarily joined" the district court proceedings to defend Interior's decision on the merits and argues that the resulting waiver "*should* apply when the litigation is complete in district court, and a direct appeal first becomes available under *Alsea Valley*." [Interior, at 49 (emphasis added)] But the response is itself speculative, and it fails on two grounds. First, the district court did not retain jurisdiction over this lawsuit. 1-ER-2. On remand, Interior must issue a new agency decision and restart the proceedings; any challenge to that decision would be a new APA suit directed at a new final agency action, not a continuation of these proceedings. Interior's theory that the Tribe's waiver carries forward into that future is unsupported. Second, this Court's precedent may foreclose extending a tribe's waiver beyond the specific proceeding in which it was made. *McClendon v. United States*, 885 F.2d 627, 631 (9th Cir.

1989) (holding a tribe waived immunity for purposes of determining the issues in the prior lawsuit, but not for "related matters, even if those matters arise from the same set of underlying facts"). Notably, the Tribe takes no position on this issue, nor does it promise to voluntarily waive its sovereign immunity in the future. More likely, the Tribe will argue that its intervention here was limited to defending Interior's 2022 trust decision on the merits and that act cannot constitute a waiver of immunity for a future suit challenging a new agency action on remand. This is enough to meet the *practical* standard this Court has set out for the third *Alsea* "consideration."

The Tribe seeks to make the legal rulings it agrees with unreviewable while preserving its own ability to challenge the rulings it disagrees with. But the Tribe faces the same risk of foreclosed review that it dismisses as too speculative when raised by the State. Suppose the current administration denies the pending application to take the Juneau parcel into trust. The Tribe would seek judicial review of that denial—but Alaska would be a required party to that suit, and Alaska, like tribes, is protected by sovereign immunity.

The parallel is direct. Alaska exercises inherent sovereign authority over its citizens and territory, and suits against it are barred absent a clear waiver or congressional abrogation. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). Alaska also has a cognizable interest in the outcome: denying a trust

application keeps the parcel within the State's primary jurisdiction rather than creating Indian country. *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998) ("Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States"). And the Federal Government cannot be relied upon to represent Alaska's interests adequately, particularly where Interior's trust responsibilities to tribes may diverge from the State's sovereign concerns. *See Maverick Gaming LLC*, 123 F.4th at 975 n.16 (recognizing that "the federal government cannot adequately represent an absent party's interest when there are tribes acting as plaintiffs in the same suit").

Given those interests, Alaska would be a required party in any suit by the Tribe challenging a denial of its trust application. *See Jamul Action Comm.*, 974 F.3d at 998. Alaska's sovereign immunity would render joinder infeasible, and the equitable factors under Rule 19(b)—which "almost always favor[] dismissal when a tribe cannot be joined due to tribal sovereign immunity," *id.*—point the same direction when it is a state, rather than a tribe, that cannot be joined. This Court's Rule 19 jurisprudence offers no principled basis for dismissing suits that threaten tribal interests while preserving suits that threaten state interests in the same lands. The wall of circuit authority runs both ways and, consequently, both the State's and the Tribe's appeals satisfy this consideration for finality.

24

Interior's suggestion (at 43–44) that its return to a prior Solicitor Opinion makes it more likely the agency will deny the Tribe's "present petition" does nothing to reduce the risk that the State will be deprived of its right to appeal the district court's legal conclusion. Interior has changed its position over each of the last four presidential administrations. [*See* Interior, at 28–32 (acknowledging history)] Moreover, as both Interior (at 43) and the Tribe (at 57) acknowledge, the district court's ruling would constitute law of the case on remand, rendering the reinstated Solicitor Opinion irrelevant to the disposition of this parcel. The Tribe goes further, criticizing Interior's most recent change of position for failing "to cite, much less discuss, the two federal court decisions directly on point concluding that the Secretary retains trust authority in Alaska (including the District Court decision here)."[6] [Tribe, at 57 (emphasis omitted)] The Tribe thus concedes that

---

[6] The Tribe's reliance on these two district court decisions is telling for an additional reason. One of those decisions is the very district court ruling now on appeal—a ruling the State challenges and that this Court is asked to review. The other is the *Akiachak* district court decision, which the D.C. Circuit vacated. *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100 (D.C. Cir. 2016). That the Tribe's best judicial support consists of the appealed decision below and a vacated district court opinion underscores the State's collateral estoppel argument, discussed *supra* at 17–18: if this Court declines to reach the trust authority question now, the Tribe will have every incentive to invoke those decisions—including the one currently on appeal—to preclude the State from relitigating the issue in future proceedings. The Tribe's own brief demonstrates precisely why the State cannot be confident that meaningful appellate review of the trust authority question will remain available after remand.

the district court's conclusion is binding on the agency below and will carry forward—while simultaneously opposing this appeal and preserving its ability to assert its sovereign immunity against any future State challenge. If that position prevails, the district court's ruling becomes insulated from appellate scrutiny, available to bind future agency proceedings without ever having been tested here.

Interior's argument (at 42) that the Court should not "prejudge a hypothetical Rule 19 motion that might be raised by a beneficiary tribe" misses the point. The jurisdictional question asks only whether, "as a practical matter," future review will be foreclosed—not whether dismissal is certain. This Court need look no further than Interior's own concession that the State's concerns are "well founded" in this Court's Rule 19 precedents to conclude that the practical standard is satisfied. And the question of how that "wall of circuit authority" applies when a party challenges a land-into-trust decision is not abstract: it is directly presented in a pending appeal before this Court. *See Federated Indians of Graton Rancheria v. U.S. Dep't of the Interior*, No. 25-4604 (9th Cir.) (appeal of district court order denying a tribe's motion to dismiss a land-into-trust challenge).

The Tribe's reliance (at 42) on *Center for Biological Diversity v. BLM*, 69 F.4th 588 (9th Cir. 2023), fares no better. In that case, this Court dismissed an appeal of a remand order because the appellant could still obtain everything it sought through the remanded agency proceeding, meaning any appellate decision

26

"could prove unnecessary." *Id*. at 595. The same cannot be said here. The State's central claim is that the Secretary lacks statutory authority to take land into trust in Alaska and it sought a declaratory judgment saying so. No agency action on remand can provide that relief—only a judicial ruling can. Remand forces the State to argue that the Secretary should decline to exercise authority that, on the State's view, he does not possess—a posture that presupposes the very thing the State contests. Unlike *Center for Biological Diversity*, dismissal here does not preserve the State's ability to obtain what it seeks; it eliminates it. Nor is there any risk that this Court's resolution of the State's appeal will prove to be a wasted appeal. The question of whether the Secretary has statutory authority to take land into trust in Alaska is a threshold question—one that must be resolved before any other aspect of this case can be finally adjudicated. This Court's answer to it will govern these proceedings and every future proceeding like them.

The Court's decision in *Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020) therefore confirms jurisdiction. There, this Court exercised jurisdiction over an intervenor's appeal of a remand order because the district court had definitively resolved a legal issue against the intervenor and directed the agency to act consistently with that ruling on remand—leaving an immediate appeal as the only avenue to contest it. *Id.* at 676. The State's position is identical. The district court definitively resolved the authority question against the State and,

27

through the remand order, directed the agency to proceed on the assumption that the Secretary retains trust authority in Alaska. That ruling will govern all further agency and district court proceedings. An appeal is the only way the State's objection to that legal conclusion can be considered.

The district court conclusively resolved controlling legal issues, the remand order compels a proceeding that will be wasted if that resolution is wrong, and dismissal will—as a practical matter—foreclose the only meaningful opportunity to correct it. All three considerations point to jurisdiction, and this Court's precedent requires none of them to stand alone.

## II. The district court erred in holding the Secretary retains broad discretionary authority to acquire land in trust for Alaska tribes post-ANCSA.

### A. The State's argument is one of statutory construction, not implied repeal.

The Tribe argues (at 43–45) that the State's position reduces to an implied repeal claim—and that because the State did not press implied repeal below, the argument is waived and the litigation should end there. But the State is not making an implied repeal argument here, and the Tribe cannot manufacture a waiver by characterizing the State's statutory construction argument as something it is not. The implied repeal framing also conveniently sets a very high bar—implied repeal is one of the most demanding standards in statutory interpretation, *see Morton v. Mancari*, 417 U.S. 535, 551 (1974)—but the State's argument does not implicate

28

that standard at all. The question is not whether ANCSA silently repealed the Alaska IRA. The question is how the relevant statutes should be read together, and what the Secretary's authority under the Alaska IRA actually encompasses when understood in the context of the comprehensive congressional scheme that followed it.

The State's argument is a straightforward application of *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), and the foundational principle of statutory construction it embodies: courts do not interpret statutes in isolation. They read provisions in context, with a view to their place in the overall statutory scheme, and they give effect to the specific policy embodied in later-enacted legislation even when that legislation has not expressly amended an earlier grant of authority. *Id.* at 143. That is not repealing anything. It is reading the law as a whole.

That is statutory construction—the same kind of analysis the Supreme Court performed in *Brown & Williamson* without anyone accusing the Court of finding an implied repeal of the FDCA. *See Biden v. Nebraska*, 600 U.S. 477, 508 & 511 (2023) (Barrett, J., concurring) (explaining that the major questions doctrine "is a tool for discerning—not departing from—the text's most natural interpretation" and that *Brown & Williamson* used "common sense" to decide whether Congress was "likely to delegate a policy decision of such economic and political magnitude

29

to an administrative agency"; *see also Brown & Williamson*, 529 U.S. at 133 ("[The Court] must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.").

Applied here, the State's argument is this: when the Alaska IRA extended §§ 5108 and 5110 to Alaska in 1936, those provisions served a specific and limited purpose—not a broad, open-ended grant of trust acquisition authority comparable to what the Secretary asserts today. The IRA itself was a remedial statute, enacted to reverse the devastating consequences of the federal allotment policy in the Lower 48, where tribal lands had been broken up and transferred out of Indian ownership. *E.E.O.C. v. Peabody W. Coal Co.*, 773 F.3d 977, 983 (9th Cir. 2014). Restoration of lost reservation lands was at the core of what §§ 5108 and 5110 were designed to accomplish.

The consequence of the allotment era is not abstract. The figures below of the Flathead Reservation in Montana illustrate what §§ 5108 and 5110 were designed to remedy.[7] In 1855, the reservation was nearly entirely tribal land. After the allotment era, it had become a dense checkerboard of tribal, fee, individual trust, state, and federal ownership—the product of policies that transferred millions

---

[7]     Available at https://fwp.mt.gov/binaries/content/assets/fwp/montana-outdoors/2024/working-lands-mj24/reservations.pdf.

of acres out of tribal hands and left the Confederated Salish and Kootenai Tribes owning only 30 percent of the land within their own reservation. The IRA's trust acquisition authority was the legislative answer to that devastation—restoring what allotment had taken. That problem never arose in Alaska. Alaska was not subject to the General Allotment Act. There were no tribal reservations broken into checkerboard patterns, no surplus land sales, no allotment-era losses to reverse.

**FLATHEAD RESERVATION LAND OWNERSHIP**



When Congress extended §§ 5108 and 5110 to Alaska in 1936, it was not replicating the Lower-48 restoration program—it was providing administrative machinery for a reservation system that had not yet been established in Alaska at all. Secretary Ickes—who testified on behalf of the Alaska IRA—explained that "Indian tribes d[id] not exist in Alaska in the same sense as in [the] continental United States," and "[i]n order, therefore, to define an Alaskan tribe it is necessary to identify it with the land it occupies and in terms of the language of the act,

'reservation.'" 3-ER-503–504. He urged that those provisions were needed to "stipulate the geographical limits of [native communities'] jurisdictions" and to fulfill the United States' obligations "in the protection of the economic rights of the Alaska natives." 3-ER-504. The trust authority was, in short, the administrative machinery for a reservation program Congress had not yet established in Alaska— a gap-filler while the broader land question remained unresolved. Interior's pre-ANCSA practice confirmed this limited purpose: over 35 years, the Secretary created six reservations encompassing 1.5 million acres under § 2 of the Alaska IRA while taking only three parcels totaling 31 acres into trust under § 5108. 3-ER-440 n.277, 478. The trust acquisition authority was never the focus; the reservation program was.

The Tribe argues (at 50–51) that § 5108 was the "capstone" of the IRA's land provisions—not an ancillary gap-filler—and that its Alaska extension therefore cannot be characterized as limited. But this conflates § 5108's role in the Lower-48 IRA with the character of its *extension* to Alaska. Whatever § 5108's central importance in reversing allotment-era devastation in the Lower 48, that purpose had no counterpart in Alaska—which never experienced allotment. Its Alaska extension served the precise gap-filling purpose Ickes described, deployed on three parcels totaling 31 acres over 35 years. The label attached to a provision

32

in one context does not determine the scope of its extension to an entirely different one.

Congress then resolved the broader land question it had left open—and in doing so, dismantled the program §§ 5108 and 5110 had been extended to Alaska to support. ANCSA extinguished all aboriginal titles, revoked all but one Alaska reservation, and declared a policy against reservation systems, lengthy wardships, and trusteeships. 43 U.S.C. §§ 1601(b), 1603, 1618(a). FLPMA completed the dismantling by repealing § 2 of the Alaska IRA—the specific reservation authority that was the foundation of the entire program. Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (1976). Congress left Alaska IRA § 1's cross-reference technically on the books but stripped away the reservation machinery that gave it operative meaning.

The text of § 5108 independently supports this reading. The statute authorizes trust acquisitions "for the purpose of providing land for Indians." 25 U.S.C. § 5108. In Alaska, Congress has already provided land for Alaska Natives—comprehensively and permanently. ANCSA transferred approximately 44 million acres and $962.5 million to Native corporations whose shareholders were required to be Alaska Natives. 43 U.S.C. §§ 1605, 1606. Congress did not merely settle a dispute; it affirmatively fulfilled § 5108's stated purpose through a different mechanism of its own choosing. An agency cannot invoke a statute's

33

authority to circumvent the mechanism Congress chose for achieving the same end. *See Motor Vehicle Mfr. Ass'n of the United States v. State Farm Mutual*, 463 U.S. 29, 43 (1983). The 1991 ANCSA amendments—which allowed Native corporations to create settlement trusts under state law, 43 U.S.C. § 1629e— confirm that when Congress wanted to provide a more tribally oriented form of land ownership for Alaska Natives, it knew how to do so without restoring IRA trust authority. Using § 5108 to recreate tribal Indian country in Alaska does not serve the purpose of providing land for Indians. The Tribe already owns the Juneau parcel in fee, 1-ER-115—Interior's action provides no land at all but simply converts existing tribal ownership into a different legal status. The claimed authority, in short, simply does not fit the comprehensive statutory scheme Congress built around it—which is precisely what *Brown & Williamson* instructs courts to recognize. 529 U.S. at 143.

The amicus argues (at 37) that ANCSA § 1601(b)'s anti-wardship language applies only to the settlement itself, leaving other sources of trust authority— including § 5108—untouched. But this parsing misreads both the text and the purpose of § 1601(b). The provision declares it to be the policy of Congress to avoid "a lengthy wardship or trusteeship" in connection with the settlement of Alaska Native claims. 43 U.S.C. § 1601(b). Congress was not writing a narrow disclaimer limited to the mechanics of the ANCSA transfer. It was expressing a

34

comprehensive policy judgment about the relationship between the federal government and Alaska Natives going forward. That judgment reflected decades of consistent understanding—from pre-statehood negotiations through the ANCSA legislative process itself—that Alaska would develop without a reservation system or tribal territorial jurisdiction, a result both the State and Alaska Native negotiators understood to be the foundation of the settlement. [*See* Alaska's Opening Br., at 24–26] Reading § 1601(b) to prohibit only the settlement's own terms from creating a trusteeship while permitting the Secretary to recreate the identical relationship through § 5108—one parcel at a time, indefinitely—renders Congress's policy declaration meaningless. Courts do not read statutes to produce that result.

The history of Interior's own shifting legal positions on this question reinforces the State's reading. The Tompkins Opinion (M-37043), issued in January 2017 in the final days of the Obama Administration, concluded that the Secretary retained broad trust acquisition authority in Alaska unconstrained by *Carcieri*. 2-ER-230–251. That opinion was temporarily withdrawn for further review by Solicitor Jorjani in 2018 after he found its analysis "incomplete and unbalanced," 2-ER-225–29, then permanently withdrawn by him in January 2021 after a thorough review identified "numerous significant omissions"—rendering its legal analysis "insufficient" to support the broad authority it claimed. 2-ER-191.

The Anderson Opinion (M-37076), issued in November 2022, then revoked Jorjani's opinion, reinstated the pro-authority position, and provided the direct legal foundation for the Assistant Secretary's 2022 decision. 2-ER-145–181. The current administration has since withdrawn the Anderson Opinion and reinstated the Jorjani opinion, returning the agency to the position that serious legal uncertainty surrounds the Secretary's trust acquisition authority in Alaska.

The agency has now changed its legal position on this question four times in less than a decade, each reversal tracking the change in administration. That pattern of instability is not what one would expect if the statutory answer were as plain as the Tribe claims. It is, however, exactly what one would expect from an agency operating in a legal landscape that, as former Solicitor Jorjani found, raises "serious concerns over the scope of the Secretary's authority"—concerns rooted in the history described above. 2-ER-191. What remained after ANCSA and FLPMA was not a broad discretionary power to recreate Indian country throughout Alaska—it was a residual cross-reference whose operative foundation had been deliberately and comprehensively dismantled, properly understood to extend only to the Metlakatla Indian Community, the one tribe whose reservation Congress specifically preserved. 43 U.S.C. § 1618(a).

## B. The Tribe's plain text argument proves too little.

The Tribe's response (at 42–45) to the State's statutory construction argument is that § 5119 says what it says, a statute's meaning is fixed at enactment, and courts cannot read away unambiguous text. But *Brown & Williamson* forecloses that response. In *Brown & Williamson*, the FDA determined that nicotine qualified as a "drug" and cigarettes as "drug delivery devices" under the FDCA—a reading that had textual support in the statutory definitions. *See* 529 U.S. at 126–27. Yet the Supreme Court held that subsequent congressional action, taken against the backdrop of the FDA's consistent position that it lacked jurisdiction, effectively ratified that position and "precluded any role for the FDA" under the existing statute. *Id.* at 144. The Court did not need an implied repeal to reach that conclusion. It needed only the recognition that subsequent, more specific congressional action illuminates the meaning and scope of the authority an earlier statute conveyed.

The Tribe also invokes (at 52–53) *Traynor v. Turnage*, 485 U.S. 535, 548 (1988), for the proposition that a narrow, specific statute is not submerged by a broader, later one. But the Tribe has the specificity analysis inverted. ANCSA (including the 1991 Amendments) is the *more specific* statute: it specifically addressed Alaska Native land claims, specifically revoked Alaska reservations and wardships, and specifically created an alternative land ownership scheme for

Alaska. Section 5119's one-sentence cross-reference to § 5108 is the more general provision. If *Traynor* applies here at all, it cuts in the State's favor—the specific, comprehensive Alaska settlement should govern over the general cross-reference, not the other way around.

The Tribe dismisses (at 54–56) the State's invocation of the reservation-disestablishment cases as "far afield." But the State is not arguing that the Supreme Court's disestablishment standard applies directly to trust acquisitions. The State is making a structural argument: the justification for requiring clear congressional intent before a reservation is disestablished applies with equal force when a reservation—or its functional equivalent—is being created.

When Congress disestablishes a reservation, it must express clear intent because it is requiring the tribe to cede its sovereign interests in the land. *Nebraska v. Parker*, 577 U.S. 481, 489 (2016). Creating Indian country after statehood involves the identical coin flipped to its other side: Congress is then requiring the State to cede its primary territorial jurisdiction to the federal and tribal governments. *See Venetie*, 522 U.S. at 527 n.1. The sovereign interests at stake are equally significant—just differently situated. There is no principled basis for demanding clarity in one direction while permitting a general cross-reference to accomplish the same jurisdictional transformation in the other. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("If Congress intends to alter the usual

38

constitutional balance between States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." (cleaned up)). This is particularly true in Alaska, where Congress acted so decisively to revoke nearly all existing Indian country. The clarity standard that governs disestablishment should govern creation in a state where Congress has already drawn that line.

That structural principle—that jurisdictional transformations of this magnitude require clear authorization in both directions—reinforces what the post-ANCSA legislative record already demonstrates. Interior's consistent position for 46 years following ANCSA was that it lacked broad lands-into-trust authority in Alaska—with the sole exception of the Metlakatla Indian Community. Land Acquisitions, 45 Fed. Reg. 62,034, 62,036 (Sept. 18, 1980). Congress legislated for four decades against that backdrop, creating a "distinct regulatory scheme" for Alaska that addressed land policy, tribal governance, and public safety without once restoring trust acquisition authority. [*See* Alaska's Opening Br. at 52–53] As the Departments of Justice and Interior jointly represented to a congressional commission as recently as March 2024, "Metlakatla is the only place in Alaska that meets the federal definition of Indian Country." *Section 4(c)(2)(C) Response of the Departments of Justice and the Interior to Not One More*: Findings and Recommendations of the Not Invisible Act Commission, Pursuant to Public Law

116-166.[8] That sustained, government-wide understanding did not arise in a vacuum. It reflects the only interpretation that makes the relevant statutes coherent.

### C. The post-ANCSA statutory scheme confirms the State's reading.

The Tribe's "capable of co-existence" analysis—and the district court's adoption of it—answers a different question. The district court asked whether ANCSA and the Alaska IRA's trust acquisition authority are irreconcilably in conflict, and concluded they are not because it is theoretically possible for land claims to be settled while the Secretary retains discretion to take additional lands into trust. 1-ER-27–28. That analysis is a sound answer to an implied repeal argument. But implied repeal is not the argument the State presses on appeal, and the "capable of co-existence" standard was not designed to resolve the question the State is actually raising.

The State's question is different: what does the Alaska IRA's grant of trust acquisition authority mean when read, as it must be, considering the full statutory scheme Congress built around it—ANCSA, the post-ANCSA enactments, and the consistent administrative understanding they produced? That is the *Brown & Williamson* question. *See* 529 U.S. at 133 (requiring courts to "fit, if possible, all parts into a harmonious whole" and to give effect to the "specific policy embodied

---

[8]     Available at: https://www.justice.gov/tribal/media/1341181/dl?inline.

in a later federal statute" even when the earlier statute has not been expressly amended). Under that framework, the absence of irreconcilable conflict is not the end of the inquiry—it is barely the beginning. The question is not whether §§ 5108 and 5110 can technically coexist with ANCSA's settlement scheme. The question is whether, when Congress enacted that comprehensive settlement—revoking all but one Alaska reservation, extinguishing all aboriginal titles, declaring a policy against reservation systems and lengthy wardships or trusteeships, and creating an entirely different mechanism for Alaska Native land ownership—it ratified or foreclosed the kind of broad trust acquisition authority the Secretary now claims. The post-ANCSA legislative record answers that question clearly: Congress legislated for over four decades with the consistent understanding that the Annette Island Reserve was the only place in Alaska that qualified as Indian country, and it created alternative mechanisms for Alaska land policy and tribal governance without once restoring trust acquisition authority. That is not an implied repeal. It is the pattern of congressional action that *Brown & Williamson* instructs courts to treat as effectively ratifying the agency's long-held position that it lacked the broad authority now claimed.

The Tribe argues (at 52) that *Venetie* is immaterial because it concerned ANCSA fee lands reconveyed by a Native corporation to a tribe and had nothing to do with IRA trust authority. But the State does not rely on *Venetie* for its specific

41

facts. *Venetie's* significance is its holding that "ANCSA ended federal superintendence over the Tribe's lands." 522 U.S. at 533 (emphasis added). That statement addresses ANCSA's comprehensive effect—not the particular mechanism by which the Tribe in that case acquired its land. Under the district court's reading, Congress only *temporarily* ended federal superintendence over Alaska Native lands, leaving one federal official with discretion to restore it parcel by parcel through trust acquisitions. *Venetie's* unqualified holding undermines that reading.

*Venetie's* holding that ANCSA "ended federal superintendence" is confirmed by everything Congress did in the decades that followed—none of which the district court addressed. *See generally* 1-ER-3–41. The 1991 ANCSA amendments addressed Alaska Native land issues by empowering Native corporations to create settlement trusts under state law, not by restoring IRA trust authority. *See* 43 U.S.C. § 1629e. The Alaska Tribal Public Safety Empowerment Act granted Alaska tribes limited jurisdiction coterminous with their villages, without creating Indian country tied to trust land. Pub. L. No. 117-103, subtit. B., §§ 811–13, 136 Stat. 49, 904–10 (2022). Congress expressly exempted Alaska from the Indian Land Consolidation Act, 25 U.S.C. § 2219(b), and it added a rule of construction at § 2219(c) providing that nothing in the section should be construed to ratify any determination supporting tribal jurisdiction over allotment

42

lands in Alaska. It is a direct signal that Congress understood Alaska's situation to be different and was unwilling to treat legislation addressing Lower-48 allotment lands as carrying over to Alaska without express authorization.

Each of these measures was enacted while Interior maintained its consistent position that no broad trust acquisition authority existed in Alaska—and each was built around that understanding. That is the *Brown & Williamson* ratification pattern. The Court did not hold merely that Congress addressed tobacco while the FDA disclaimed jurisdiction. It held that Congress enacted tobacco-specific legislation "premised on the belief that the FDA lacks such jurisdiction"—meaning Congress relied on the agency's position when constructing the alternative scheme. 529 U.S. at 156. Congress has done the same here. It has not been silent while Interior disclaimed authority. It has been actively legislating premised on that disclaimer, creating alternative mechanisms for every problem the claimed trust authority would otherwise address. *Brown & Williamson* does not require an express congressional statement—it requires the pattern of active, reliant legislation the record here displays.

The amicus (at 37) conflates two distinct legal concepts: the federal government's general trust *responsibility* toward Alaska Natives—a broad obligation reflected in health care, education, and welfare statutes—and the specific statutory *authority* to take land into trust under § 5108, a discrete land-

43

acquisition power. The existence of the former does not establish the scope of the latter. The amicus's invocation (at 37 n.5) of the Indian Health Care Improvement Act, the Indian Child Welfare Act, and the Indian Self-Determination and Education Assistance Act as evidence that federal trust relationships survive ANCSA proves only that Congress maintained its obligation of care—not that it authorized the Secretary to acquire sovereign land. They are not the same thing.

The amicus brief's reliance (at 35) on *Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*, 228 F.3d 82 (2d Cir. 2000), and the Maine/Connecticut settlement act comparison actually supports the State's position once the Second Circuit's reasoning is examined rather than just its conclusion. The *Blumenthal* court held that trust acquisition authority survived the Connecticut Indian Land Claims Settlement Act because "the Settlement Act was not . . . a comprehensive statute intended to settle once-and-for-all the extent of the Mashantucket Pequot's sovereignty." 228 F.3d at 90. The court explained that the Connecticut settlement emerged from a specific 1976 lawsuit over cloud on title in a single Connecticut town and was designed to implement a private agreement; Congress saw it as providing "federal implementation of the private agreement negotiated between the parties that would end the existing lawsuit." *Id*. "Nothing in the Act," the court concluded, "indicates that Congress intended to establish the outermost boundaries of the Tribe's sovereign territory." *Id.*

44

ANCSA was precisely what the Connecticut settlement was not. It was a comprehensive statute that did intend to settle once and for all the extent of Alaska Native land rights—revoking all reservations, extinguishing all aboriginal titles, transferring 44 million acres to Native corporations, and declaring a permanent policy against reservation systems, lengthy wardships, and trusteeships. 43 U.S.C. §§ 1601(b), 1603, 1618(a). Under *Blumenthal*'s own reasoning, it is this comprehensive, sovereignty-defining character that distinguishes a settlement act that forecloses broad trust acquisition authority from one that does not. The amicus uses the case's conclusion without engaging its premise—and the premise compels a different result for ANCSA.

The Maine Settlement Act itself confirms this reading rather than undermining it. The trust acquisition bar was not an isolated added clause—it was part of a comprehensive interlocking package of statewide protections. The bar covers not just the named settlement tribes but all Indians in the State of Maine: "Except for the provisions of this Act, the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians or Indian nations, or tribes, or bands of Indians in the State of Maine." Pub. L. No. 96-420, § 5(e), 94 Stat. 1785, 1791 (1980). Alongside it, Congress provided that future federal Indian laws would not apply in Maine unless specifically made applicable. *Id.* § 16(b), 94 Stat. at 1795. Together, these provisions formed an

45

interlocking scheme that insulated Maine's settlement choices from being undone by subsequent general Indian legislation. ANCSA accomplished functionally the same insulation—without requiring identical language—through provisions that were themselves the substantive equivalent: revoking all but one Alaska reservation, extinguishing all aboriginal titles, declaring a permanent policy against reservation systems and lengthy trusteeships, and transferring 44 million acres through a mechanism specifically designed to replace the federal wardship model. The absence of Maine-style text in ANCSA is not evidence of a congressional choice to preserve trust authority. It reflects that ANCSA's comprehensive substantive framework accomplished what Maine's explicit provisions accomplished—through different means but to the same end.

The *Blumenthal* court also dismissed Connecticut's checkerboard jurisdiction concerns as "a policy argument better addressed to Congress." 228 F.3d at 94. That dismissal made sense for a narrow settlement covering parts of a single Connecticut town. It does not translate to Alaska, where restoring trust acquisition authority for 229 tribes—39.5 percent of all federally recognized tribes in the country—across a state larger than Western Europe would produce exactly the jurisdictional transformation the *Blumenthal* court said Congress, not courts, must address. The court observed it was not its function to compensate for Congress's failure to provide for the Tribe's economic good fortune. Congress did

46

not fail to provide for Alaska Natives—it provided comprehensively and permanently through ANCSA. The State is not asking this Court to compensate for a legislative gap. It is asking the Court to recognize what the comprehensive legislative settlement Congress actually enacted means for the authority it left technically in place.

**D.    The State's Metlakatla concession confirms, rather than undermines, its reading.**

The Tribe (at 56) and amicus (at 13 n.2) suggest that because the State concedes trust authority for the Metlakatla Indian Community, the State must concede that § 5119's cross-reference to § 5108 remains operative—and if it remains operative, the Secretary's discretion under it is unlimited. That inference does not follow.

The State's Metlakatla concession reinforces rather than undermines this reading. The State does not contend that § 5119's cross-reference to § 5108 was entirely eliminated by ANCSA—if it were, there would be no trust authority in Alaska at all. The State's argument is more precise: § 5119's cross-reference to § 5108 survives ANCSA, but its operative scope is defined by what ANCSA left intact. ANCSA revoked every Alaska reservation except one—the Annette Island Reserve, which Congress expressly preserved. 43 U.S.C. § 1618(a). That textual choice—express preservation for one, revocation for all others—is the most specific possible congressional statement about which tribal land relationships in

47

Alaska were to survive the settlement. Reading the statutes together, the only coherent limiting principle is this: the Secretary's trust acquisition authority under § 5108 extends to the one tribe whose reservation Congress specifically chose to maintain—Metlakatla—and no further. That is not a concession that undermines the State's argument. It is the argument.

### E. The major question doctrine applies.

The major questions doctrine applies here notwithstanding the Tribe's argument (at 48–51) that the Alaska IRA's plain text is unambiguous and a statute's meaning cannot change over time. That argument misunderstands the doctrine. The major questions doctrine does not presuppose ambiguous text—it applies when an agency claims authority that, given the breadth and significance of what is asserted, requires clearer and more specific congressional authorization than a general or cross-referencing grant will supply. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). This Court applies a two-part inquiry: whether the agency action is unheralded and represents a transformative expansion of authority in a rarely used provision, and whether it is of vast economic and political significance. *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024). Both are met here.

On the first prong, Interior changed a position it had maintained for 46 years—that it lacked broad trust acquisition authority in Alaska—only when a Democratic administration took office in 2017. The authority was located in a

48

cross-reference that, over 35 years of application, produced all of 31 acres of trust acquisitions. 3-ER-440 n.277, 478. The Tribe argues the authority has existed since 1936 and § 5108 was the IRA's "capstone." But a provision's label does not insulate it from the doctrine. What matters is how the claimed authority has actually been exercised—and authority exercised on three parcels in 35 years, then dormant for 46 more, is precisely what the doctrine targets as "long-extant, but rarely used." *Su*, 121 F.4th at 14. The four administration-linked position reversals in less than a decade further confirm that the claimed "capstone" authority is anything but settled.

On the second prong, the Tribe argues that trust acquisitions in a single state lack the nationwide, billion-dollar impact the doctrine requires and that the parcel at issue here is a fraction of an acre. But the major questions doctrine asks about the scope of the *claimed authority*, not the size of the individual decision at issue. The question is not what happens to this 787-square-foot parking lot—it is what happens if the Secretary has authority to do this for any of 229 federally recognized Alaska tribes, 39.5 percent of all tribes in the country, in a state where Congress specifically dismantled the reservation system. [*See* Alaska's Opening Br. at 68–69] Moreover, the Supreme Court has never held the doctrine applies only to billion-dollar economic impacts. *Gonzales v. Oregon*, 546 U.S. 243 (2006)—identified as a major questions case in *West Virginia*, 597 U.S. at 722—

49

concerned physician-assisted suicide in a single state with no nationwide economic significance. What it had was profound political significance: a question of who governs a fundamental sphere of life. Creating Indian country in Alaska raises that same question at the level of an entire state: who governs the land, and under whose laws do 229 tribes and their neighbors live. That is not a minor question, regardless of the acreage of the first parcel.

**F.    Trust land for a tribe is Indian country regardless of whether a reservation proclamation accompanies it.**

Contrary to the Tribe's contention (at 54), this case directly raises the question of whether trust lands acquired by the Secretary for a tribe constitute Indian country. That position is not credible. The caselaw is unambiguous: tribal trust land is Indian country. *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 511 (1991) ("[T]he test for determining whether land is Indian country does not turn upon whether the land is 'trust land' or 'reservation.'"); *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 666 (9th Cir. 1975) (holding that land taken into trust under the IRA is held "free of state regulation"). The Tribe cannot escape the jurisdictional consequences of what it is asking by declining to characterize those consequences. What the Tribe seeks is Indian country (i.e., territorial jurisdiction)—and the State has standing to contest its creation.

The district court's suggestion that it might have viewed the decision differently had the Assistant Secretary also issued a reservation proclamation reflects a similar confusion. 1-ER-30–31. The legal distinction between trust land and a formally proclaimed reservation is narrow and practically immaterial to the State's interests. The only meaningful difference between Indian country that is a reservation and Indian country that is tribal trust land is what happens when the land is later conveyed to non-Native ownership: reservation land retains Indian country status notwithstanding any conveyance, *see* 18 U.S.C. § 1151(a), whereas trust land loses Indian country status if the trust is terminated. [*See* Alaska's Opening Br. at 16 n.1] That distinction has no bearing on the jurisdictional consequences that attach while the land is held in trust. Once the parcel is taken into trust, state and local regulatory, taxing, and criminal jurisdiction are displaced regardless of whether a reservation proclamation accompanies the acquisition. The district court's apparent comfort with the trust acquisition absent the reservation proclamation misapprehends what trust status actually means for the State—and the Tribe's disclaimer that this case is not about Indian country should not be permitted to obscure that reality.

### III.     The district court correctly vacated Interior's decision on other grounds, and the Tribe's cross-appeal should be denied.

The district court vacated Interior's decision on two independent grounds, both of which the Tribe now contests.

*First*, the court held that 25 U.S.C. § 5129 (IRA § 19) contains no standalone "Alaska Definition" of Indian. 1-ER-33. Drawing on § 19's text and Interior's 1937 initial view, the court agreed that the Alaska clause "should be read in conjunction with the three criteria defining 'Indian,'" because otherwise "there would be no law as to what persons of Indian blood were eligible for benefits and organization." 1-ER-36. The court found that reading confirmed by *Carcieri v. Salazar*, 555 U.S. 379 (2009), in which the Supreme Court held that § 19 "explicitly and comprehensively defined the term ['Indian'] by including only three discrete definitions"—and listed only those three criteria, without identifying any separate, fourth definition applicable to Alaska Natives. 1-ER-36. Because Interior had made no findings on whether the Tribe satisfied any of the three definitions, the court vacated and remanded for further proceedings. 1-ER-38–40.

*Second*, the court found the Assistant Secretary's "restoration of Indian lands" justification to be arbitrary and capricious as contrary to ANCSA. 1-ER-31–33. The Assistant Secretary had grounded the trust acquisition in part on the premise that taking the Juneau parcel into trust would effectuate the "restoration of Indian lands," noting that the Tribe's "ancestors used areas in and around Southeast Alaska, including the area now known as Juneau, as their traditional and cultural homeland since time immemorial." 1-ER-31–32. The court held that this rationale necessarily implied the agency intended to return land to the Tribe based

52

on aboriginal title—a right Congress extinguished through ANCSA "in return . . . [for] the transfer of $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations." 1-ER-32–33. To the extent the Assistant Secretary relied on that rationale, the court found it arbitrary and capricious because it rested on a factor—aboriginal title—that Congress had deliberately foreclosed when it enacted ANCSA. 1-ER-33.

Both rulings are correct. The Tribe's conditional cross-appeal should be denied.

### A. The Alaska clause in § 5129 is not a standalone definition that exempts Alaska tribes from the "under Federal jurisdiction" requirement.

#### 1. *Carcieri* does not resolve this issue in the Tribe's favor.

The Tribe's lead argument is that footnote 6 of *Carcieri* affirmatively held that Alaska tribes need not satisfy any of § 5129's three definitional requirements. That is not what *Carcieri* held, and the district court was correct to reject that reading.

The relevant passage of *Carcieri* arose in the Court's explanation of why, if Congress had wanted to extend the IRA's trust acquisition authority to tribes that lacked federal jurisdiction in 1934, it "chose to expand the Secretary's authority" through separate, explicit enactments—citing the Alaska IRA as one example. 555 U.S. at 392 & n.6. The Tribe reads this as a holding that Alaska tribes are

53

categorically exempt from § 5129's definitional requirements altogether. But that is not a fair reading of the footnote. The Court was explaining the *mechanism* by which Congress expanded trust authority to additional groups—not making a definitive ruling on the scope of § 5129's Alaska clause, which was not at issue in *Carcieri* at all. As the district court correctly observed, the footnote was "simply referencing the fact that the Alaska IRA extended the Secretary's trust land acquisition authority [§ 5108] and the definitional section [§ 5129] to the Territory of Alaska." 1-ER-37. The Court "did not further hold or comment that Alaska Natives need not fit into one of the three definitions of 'Indian' in § [5129]." *Id.*

Judicial opinions are not authority for propositions they did not consider. *See Cohens v. Virginia*, 19 U.S. 264, 399–400 (1821). The question whether the Alaska clause in § 5129 operates as a freestanding exemption from the "now under Federal jurisdiction" limitation was not presented in *Carcieri*—the case involved a Lower-48 tribe (the Narragansett) and had nothing to do with Alaska. A footnote observation about the Alaska IRA as a historical example of congressional action cannot bear the weight the Tribe assigns to it.

### 2.      The district court correctly read § 5129.

The text, structure, and history of § 5129 all confirm what *Carcieri* assumed: the Alaska clause is a clarifying sentence within a unified definitional provision,

54

not a standalone fourth definition that displaces the three substantive eligibility requirements.

*First*, when Congress passed the IRA in 1934, most of its provisions were simply inapplicable to Alaska. The federal government had not yet recognized Alaska tribes, jurisdiction over individual Alaska Natives was limited, and federal benefits were defined by blood quantum related to race or ancestry. *See, e.g.*, *United States v. Rogers*, 45 U.S. 567, 573 (1846) (concluding that a "white man" who was recognized by a tribe as a tribal member, was not an "Indian" within the meaning of the 1834 Trade and Intercourse Act, because "Indians are regarded as belonging to their race"). Alaska's own Congressional delegate, Anthony Dimond, conceded that "[s]o far as Alaska is concerned, not so many of the provisions of the bill can apply." 78 Cong. Rec. 11830 (June 15, 1934). Prominent attorney and executive member of the Alaska Native Brotherhood William Paul agreed that there was "very little [in the bill] that can apply to Alaska, and that little appears to be entirely beneficial—the matter of education principally," and that "[s]ome people without an understanding of the legal position of the Alaska native would think these natives would come under the bill." FER-7.

The Alaska clause in § 5129 was added to resolve a specific and narrow problem: whether indigenous peoples in Alaska—particularly Eskimos and Aleuts—were ethnographically "Indian" and therefore within the IRA's reach at

all. In the early twentieth century there was genuine debate about whether groups not typically described as "Indians" in the Lower-48 sense fell within federal Indian legislation. That same concern permeates contemporaneous Alaska legislation—the Alaska Native Allotment Act applies to "any Indian or Eskimo of full or mixed blood," Act of May 17, 1906, ch. 2469, 34 Stat. 197, the Alaska Statehood Act disclaims title to property held by "any Indians, Eskimos, or Aleuts (hereinafter called natives)," Alaska Statehood Act, Pub. L. 85-508, § 4, 72 Stat. 339 (1958), and numerous other federal statutes of the era take care to name both "Indians" and "Eskimos" separately to ensure both are covered.[9] Congress resolved the same debate in the IRA by clarifying that all indigenous peoples of Alaska, regardless of ethnographic classification, were to be considered "Indians" for purposes of the Act. *Cf.* FER-9 (earlier version of H.R. 7902 that does not

---

[9] *See also* An Act to Establish an Alaska Game Commission, 52 Stat. 1169, § 2 (1938) (protecting Indians and Eskimos from certain gaming regulations and defining "Indian" and "Eskimo" in Alaska by blood); Reindeer Industry Act, § 15, 50 Stat. 900 (1937) (creating self-sustaining and exclusive reindeer industry for natives of Alaska and defining "natives of Alaska" as "native Indians, Eskimos, and Aleuts of whole or part blood inhabiting Alaska at the time of the Treaty of Cession" and their descendants and the Indians who migrated to Alaska from Canada); An Act for the Protection and Regulation of the Fisheries of Alaska, 48 Stat. 594 (1934) (regulating fishing with exceptions for "native Indians" and defining "native Indians" as "members of the aboriginal races inhabiting Alaska when annexed to the United States, and their descendants of the whole or half blood"); Alaska Native Townsite Act, 44 Stat. 629 (1926) (authorizing townsites for "Indian or Eskimo of full or mixed blood").

clarify that "Indians" include Eskimos and other aboriginal Alaskans) *with* 3-ER-509 (IRA § 19). Delegate Dimond confirmed this purpose when he explained that in referring to "Indians of Alaska," he meant "to include, of course, the Eskimos." 78 Cong. Rec. 11830 (June 15, 1934). That is the work the clause was doing: ethnographic inclusion, not the creation of an alternative eligibility pathway that eliminated the Act's substantive requirements.

That the Alaska clause did not displace the three substantive criteria is confirmed by § 19's (25 U.S.C. § 5129's) definition of "tribe." Section 19 defines "tribe" as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." That definition incorporates the three-criteria definition of "Indian" that precedes it—including the requirement that a tribe have been recognized and under federal jurisdiction in 1934. If the Alaska clause were a standalone exemption from those criteria, the definition of "tribe" would be rendered meaningless as applied to Alaska tribes. There would be no meaningful limiting principle governing which tribal entities could invoke the IRA's trust-acquisition authority. Congress does not enact definitions it intends to be discarded.

*Second*, Felix Cohen—whose views on the IRA carry particular weight—addressed this question directly and concisely: "It seems to me that sec. 19 puts Eskimos on the same basis as Indians. To qualify for the benefits of the W.H. act [the Wheeler-Howard Act, or IRA] they must meet one of 3 criteria: tribal

57

affiliation, tribal descent plus residence on a reservation, or the half-blood test."

FER-1. Cohen's formulation is incompatible with the Tribe's standalone reading: if

the Alaska clause were a freestanding definition creating independent eligibility,

there would be no reason to apply the three criteria to Alaska Natives at all. The

district court, for good reason, also cited the 1937 opinion of Cohen and two other

Interior Assistant Solicitors, which concluded that the Alaska clause "should be

read in connection" with the three criteria defining "Indian," because otherwise

"there would be no law as to what persons of Indian blood were eligible for

benefits and organization." 1-ER-36 (quoting FER-5). The Tribe does not address

this contemporaneous Interior interpretation—but it is precisely the kind of

authoritative, contemporaneous understanding that courts credit in questions of

statutory interpretation, and it is entitled to weight here. *See Loper Bright*

*Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued

contemporaneously with the statute at issue, and which have remained consistent

over time, may be especially useful in determining the statute's meaning.").

*Third*, if the Alaska clause were a standalone definition with no blood-

quantum or jurisdictional limitation, then any person of even marginal Alaska

Native ancestry—regardless of tribal membership or blood quantum—would

qualify as an "Indian" under the IRA and be eligible for all of its benefits. A person

with identical ancestry in the Lower 48, lacking tribal membership and below the

half-blood threshold, would not. Congress could not plausibly have intended to extend more generous IRA benefits to Alaska Natives than to Lower 48 Indians. That outcome is directly contrary to the contemporaneous understanding that the IRA's application in Alaska was *limited* relative to the Lower 48, not expanded. The Tribe's reading cannot be squared with Alaska's own congressional delegate's concession that "not so many of the provisions of the bill can apply" to Alaska. 78 Cong. Rec. 11830 (June 15, 1934).

*Fourth*, *Carcieri* described § 5129 as containing "only three discrete definitions" of Indian. 555 U.S. at 391–92. The Court counted three—not four. If the Alaska clause were a freestanding fourth definition, the Supreme Court would have said so. The Tribe asks this Court to conclude that the Supreme Court miscounted, or that the Alaska clause does not "count" as a definition despite performing precisely that function. Neither escape is available.

### B. The district court correctly found the restoration rationale arbitrary and capricious.

#### 1. The harmless error doctrine does not apply here.

The Tribe's harmless error argument fails at the threshold for a reason *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943) makes clear: it asks this Court to affirm the Secretary's decision under a regulatory framework he never applied. The Secretary identified the applicable regulatory standard in his decision, saying the 2022 version of 25 C.F.R. § 151.11(b) provides that "as the distance between a

59

tribe's reservation and the land to be acquired increases, the Secretary will give greater scrutiny to a tribe's justification of anticipated benefits from the acquisition and give greater weight to the concerns raised by the state and local governments having regulatory jurisdiction over the land to be acquired in trust." 2-ER-125. The district court applied the same 2022 version. 1-ER-19 n.68. The eight-purpose structure on which the Tribe's harmless error argument entirely depends— including § 151.11(b)(8)'s "self-determination" purpose as an asserted independent basis for the acquisition—did not take effect until January 11, 2024, more than a year after the Secretary issued his decision on November 17, 2022. *See* Land Acquisitions, 88 Fed. Reg. 86222 (Dec. 12, 2023). The Tribe is asking this Court to affirm a decision the Assistant Secretary grounded in the 2022 regulation by reference to a regulatory framework he never cited, never applied, and that had no legal existence when he acted. *Chenery* directly forecloses that approach.

The Tribe does not argue that the regulation in effect at the time the Secretary issued its decision supports the land-into-trust decision. [*See* Tribe at 62– 65] Indeed, the 2022 version required the Secretary to apply *greater* scrutiny as distance from the tribe's reservation increases—and to give *greater weight* to state and local government concerns. *See* 25 C.F.R. 151.11(b) & (d) (2022). The Secretary acknowledged that the Tribe has no reservation at all, because ANCSA revoked the reserves previously set aside for Alaska Native groups. 2-ER-125.

Because the Tribe had no reservation, the Secretary could not apply the distance-and-scrutiny framework in the ordinary way. His solution was to treat the Tribe's "recognized traditional homelands" as the functional equivalent of a reservation—the same framing the district court found to be impermissibly grounded in aboriginal title. 2-ER-31–33; 2-ER-125–126. The traditional homelands analysis was not incidental to the § 151.11(b) finding; it was the Secretary's entire basis for satisfying the regulation's scrutiny requirement.

The Assistant Secretary's reference to self-determination and federal funding does not mean the Secretary made findings under distinct subsections of the not-yet-in-effect regulation. He reasoned that "[t]he anticipated benefits of acquiring the Parcel into trust include restoration of Indian lands and increased self-determination. Having the land in trust will also allow the Tribe to access federal funding and grants only available for trust lands." 2-ER-126. Those references were cumulative benefits appended to the restoration rationale—not independent regulatory grounds capable of sustaining the decision on their own after the primary rationale is struck. The Tribe cannot restructure the Secretary's decision on appeal into a form it did not take in the record.

The regulatory problem runs deeper than the version of § 151.11 the Secretary applied. The entire Part 151 framework is structurally inapplicable to Alaska tribes because it was built around a prerequisite Alaska tribes cannot

61

satisfy: having a reservation. The 2022 regulations provided for both on- and off-reservation acquisitions, but the off-reservation acquisitions had to be in close enough proximity to the Tribe's reservation to merit the application. 25 C.F.R. § 151.11(b) (2022). An "Indian reservation" is "that area of land over which the tribe is recognized by the United States as having governmental jurisdiction." 25 C.F.R. § 151.2(f) (2022). That is a jurisdictional definition, not a geographical one. It requires prior federal recognition of tribal governmental authority over territory— not merely tribal status or membership. Alaska tribes other than the Metlakatla Indian Community have not been recognized as exercising governmental jurisdiction over any territory. *Venetie* held that ANCSA lands did not constitute Indian country and that Alaska Native villages lacked the federal superintendence over land that creates the sovereign territorial relationship the definition presupposes. 522 U.S. at 532–33. The Secretary acknowledged that the Tribe "does not have a reservation as defined by the Department's land into trust regulations." 2-ER-125. That acknowledgment is not merely a factual observation—it is a concession that the foundational prerequisite for the Part 151 framework is absent. The Secretary's decision to substitute "recognized traditional homelands" for the missing reservation was not a permissible regulatory interpretation; it was a unilateral rewriting of a definition that can only be changed through notice-and-comment rulemaking. *State Farm*, 463 U.S. at 43.

Interior's 2023 rulemaking acknowledged this structural problem by promulgating § 151.12, a new provision specifically addressing "initial Indian acquisitions" for tribes that "do not have a reservation or land held in trust." 25 C.F.R. § 151.12 (2024); Land Acquisitions, 88 Fed. Reg. 86,222 (Dec. 12, 2023). That provision's existence confirms that the prior regulatory framework was inadequate for this situation—if the 2022 regulations had provided a workable framework for tribes without reservations, § 151.12 would have been unnecessary.

But § 151.12 does not rescue the Tribe's position even prospectively, because most of its enumerated beneficial purposes are structurally inapplicable to Alaska tribes by operation of ANCSA. Six of the eight purposes are unavailable: "protects Tribal homelands" resurrects the aboriginal title ANCSA extinguished, 43 U.S.C. § 1603; "consolidates land ownership" presupposes a pre-existing tribal land base to consolidate around; "reduces checkerboarding" is a Lower-48 allotment-era phenomenon with no counterpart in post-ANCSA Alaska; "acquires land lost through allotment" is explicitly keyed to the allotment history Alaska did not endure—Alaska was not subject to the General Allotment Act's reservation-breakup policy that § 151.12(b)(6) was designed to address; and "protects treaty or subsistence rights" has no application to Alaska tribes because their "aboriginal hunting or fishing rights" were also extinguished by ANCSA, 43 U.S.C. § 1603(b). "Protects sacred sites or cultural resources and practices" could apply if the

63

particular parcel has specific, documentable sacred or cultural significance—but the Secretary made no such finding here, and it cannot substitute for the restoration rationale the district court found impermissible. That leaves only § 151.12(b)(8)— "facilitates Tribal self-determination, economic development, or Indian housing"— the same catch-all purpose already embedded in § 151.3(a)(3) (2022) that has always nominally been available. The pattern across both the 2022 and 2024 regulations is consistent: every Part 151 framework assumes the allotment-era conditions, existing reservations, or pre-existing tribal territorial jurisdiction that post-ANCSA Alaska lacks. Interior has never promulgated a regulatory framework that actually fits the Alaska trust acquisition context—because every framework it has devised assumes the allotment-era conditions, existing reservations, and tribal territorial jurisdiction that ANCSA deliberately dismantled.[10] The regulatory gap is not an oversight. It reflects the same fundamental question this litigation presents.

---

[10]  Section 151.12(c) raises independent concerns about the validity of the 2024 regulation as applied to Alaska tribes. That provision states that when a tribe has no reservation or trust land, the Secretary "presumes that the acquisition will further the Tribal interests described in paragraph (b) of this section" and therefore the "application should be approved." 25 C.F.R. § 151.12(c) (2024). Applied to Alaska tribes, this presumption is inverted: as described above, six of § 151.12(b)'s eight enumerated purposes either do not exist in Alaska or are foreclosed by ANCSA. A regulation that presumes an acquisition furthers purposes that structurally cannot be satisfied—and on that basis presumes the application should be approved—is not a reasoned exercise of regulatory authority. *See State Farm*, 463 U.S. at 43. The 2024 regulation replaced heightened scrutiny with a

64

The Tribe's harmless error argument is undermined by its own concession (at 40) that "the Secretary may potentially moot out this entire controversy on remand"—a scenario that contemplates the Secretary declining to exercise his discretion to acquire the subject land in trust. Interior's brief (at 33–34) goes further, noting that the reinstatement of the Jorjani Opinion "increases the likelihood that Interior, on remand, will deny the Tribe's present petition." Those concessions are fatal: if approval were truly inevitable based on the remaining findings alone, a change in Solicitor Opinion could not affect the outcome. *See Lotus Vaping Tech., LLC v. U.S. Food & Drug Admin*, 73 F.4th 657 (9th Cir. 2023) (stating that "[a]n error is harmless if it 'had no bearing on the procedure used or the substance of [the] decision reached"). The Tribe cannot argue both that the error was harmless because remaining factors compel the same result and that the Secretary retains meaningful discretion—now likely to be exercised differently—to deny the application entirely.

### 2. The townsite characterization does not rescue the restoration rationale.

The Tribe's alternative argument is that the "restoration of Indian lands" rationale had nothing to do with aboriginal title, because the Juneau parcel was located within a Native townsite established under the Alaska Native Townsite

---

presumption of approval for the same situation—a result incompatible with ANCSA's comprehensive settlement.

Act—and ANCSA left Townsite Act lands untouched. The Tribe contends (at 63–65) that restoring townsite lands to tribal ownership is legally distinct from resurrecting aboriginal title claims, and that the applicable regulation simply asks whether the acquisition "protects tribal homelands."

That argument fails at multiple levels. As an initial matter, the regulatory language the Tribe invokes—§ 151.11(b)(1)'s reference to "protecting tribal homelands"—appears in the 2024 version of the regulation, which did not take effect until more than a year after the Secretary issued his decision. The Secretary applied the 2022 version. As explained above, the 2022 version contains no such enumerated purpose. The Tribe cannot reframe the Secretary's decision through a regulatory lens that did not exist when he acted.

The townsite argument also fails on its own terms. The Alaska Native Townsite Act conveyed restricted lots to *individual* Alaska Natives, not to tribes. Alaska Native Townsite Act, Pub. L. No. 69-280, Ch. 379. 44 Stat. 629 (1926). Characterizing a trust acquisition for the *Tribe's* benefit as the "restoration" of a *tribal* homeland is not a townsite analysis—it requires precisely the kind of aboriginal title concept that ANCSA extinguished.

More fundamentally, the Secretary did not frame his decision as a townsite analysis. He mentioned the Juneau Indian Village and Lingít Aaní by name, but did so in the context of establishing that the Tribe's "ancestors used areas in and

66

around Southeast Alaska . . . as their traditional and cultural homeland since time immemorial." 2-ER-125–126. He cited no provision of the Townsite Act. He made no finding that the townsite's legal status provided a basis for the acquisition independent of the Tribe's ancestral connection to the land. Aboriginal title requires a showing of "actual, exclusive, and continuous use and occupancy 'for a long time,'" measured "in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers." *Native Village of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012) (en banc) (citations omitted). The Secretary offered no alternative test for what makes a homeland "traditional"—and the framing he used is materially identical to the test for aboriginal title. ANCSA extinguished all aboriginal title and all claims based on it. 43 U.S.C. §§ 1603, 1618(a). The Tribe's own application made the connection explicit, describing the acquisition as an effort to "regain land that it previously lost." 2-ER-120.

The Tribe's attempt to recharacterize the Secretary's stated basis as a townsite rationale is precisely the kind of post-hoc rationalization that *Chenery* prohibits. If the Secretary intended to justify the acquisition on the specific ground that the parcel's townsite status provided a legally distinct basis untouched by ANCSA, that reasoning needed to appear in the decision. The district court correctly evaluated—and properly rejected—the rationale the agency actually offered.

67

The district court's vacatur and remand on this ground should be affirmed.

## CONCLUSION

The State respectfully requests the Court reverse the district court and hold the Secretary's discretion to take lands into trust in Alaska is limited to the Metlakatla Indian Community. It further requests a remand to the district court with direction to enter judgment in favor of the State.

## ADDENDUM

Except for the following, all pertinent statutory authorities are set out in the addendums previously provided by the State and the Tribe. 9th Cir. R. 28-2.7.

## STATEMENT OF RELATED CASE

The appeal in *Federated Indians of Graton Rancheria (FIGR) v. U.S. Department of the Interior*, No. 25-4604, is related because it raises the same or closely related issues. *See* Ninth Cir. R. 28-2.6. Like the State here, the plaintiff in *FIGR* sued under the Administrative Procedure Act to challenge a Department of the Interior decision to take land into trust under the Indian Reorganization Act. The tribe benefiting from that decision filed a motion to dismiss under Federal Rule of Civil Procedure 19, arguing that it was a necessary and indispensable party that could not be joined based on its sovereign immunity. The district court denied the tribe's motion to dismiss and the tribe appealed.

This case is related to the State's appeal because the Rule 19 issue is closely related to the arguments the State raises in response to the requests to dismiss its appeal.

Date: May 11, 2026.

STEPHEN J. COX
ATTORNEY GENERAL

/s/ *Jessica M. Alloway*
Jessica M. Alloway

Attorney for the State of Alaska

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellant ACMS system.

Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

Date:  May 11, 2026.

STEPHEN J. COX
ATTORNEY GENERAL

/s/ *Jessica M. Alloway*
Jessica M. Alloway

Attorney for the State of Alaska

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** <u>Nos. 24-5280 & 24-5285</u>.

I am the attorney or self-represented party.

**This brief contains** <u>13,989</u> **words,** including <u>17</u> words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ X ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Jessie M. Alloway*_____ **Date 5/11/2026**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*